Michael N. Nemelka (*pro hac vice*)
  mnemelka@kellogghansen.com
Aaron M. Panner (*pro hac vice*)
  apanner@kellogghansen.com
Joshua D. Branson (*pro hac vice*)
  jbranson@kellogghansen.com
Joshua Hafenbrack (*pro hac vice*)
  jhafenbrack@kellogghansen.com
KELLOGG, HANSEN, TODD,
  FIGEL & FREDERICK, P.L.L.C.
1615 M Street, N.W.
Suite 400
Washington, D.C. 20036
Telephone:  (202) 326-7900
Fax:  (202) 326-7999

Gary Salomons (SBN 126280)
  gary@gabrielsalomons.com
Daniel J. Friedman (SBN 289670)
  daniel@gabrielsalomons.com
GABRIELSALOMONS, LLP
16311 Ventura Blvd., Ste. 970
Encino, CA 91436
Telephone:  (818) 906-3700
Fax:  (818) 906-2142

*Counsel for Plaintiff Motor Vehicle
Software Corporation*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MOTOR VEHICLE SOFTWARE CORPORATION<br><br>                              Plaintiff,<br><br>        vs.<br><br>CDK GLOBAL, INC.; THE REYNOLDS AND REYNOLDS COMPANY; COMPUTERIZED VEHICLE REGISTRATION, INC. a/k/a CDK VEHICLE REGISTRATION, INC.<br><br>                              Defendants. | CASE NO.:  2:17-cv-00896-DSF-AFM<br><br>MVSC'S CONSOLIDATED OPPOSITION TO THE MOTIONS TO DISMISS OF REYNOLDS, CDK, AND CVR<br><br>JURY TRIAL DEMANDED<br><br>Hearing: Sept. 11, 2017<br>Time: 1:30 pm<br>Place: Courtroom 7D<br><br>Judge: The Hon. Dale S. Fischer |

# MVSC'S CONSOLIDATED OPPOSITION
## TO THE MOTIONS TO DISMISS OF REYNOLDS, CDK, AND CVR

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF CONTENTS

INTRODUCTION ........................................................................... 1

BACKGROUND ............................................................................. 4

    A.    Parties and Industry Background ........................................ 4

    B.    The CDK and Reynolds Horizontal Conspiracy .................. 6

    C.    Harm to MVSC and Competition ........................................ 9

    D.    The Authenticom Lawsuit and Preliminary Injunction ........ 9

ARGUMENT ................................................................................ 10

    I.    MVSC Has Alleged an Unlawful Conspiracy Under § 1 .................. 10

    II.    MVSC Has Alleged Unlawful Monopolization and Attempted
        Monopolization ...................................................... 19

        A.    MVSC Adequately Pleads That Defendants Monopolized
            The Illinois EVR Market .................................... 19

            1.    Defendants Have Monopoly Power in Illinois Through A
                Single Entity, CVR ............................................ 20

            2.    Defendants Acquired and Maintain Their Monopoly in
                Illinois Through Exclusionary Practices ................ 21

        B.    MVSC Properly Alleges That Defendants Have Attempted
            To Monopolize The California EVR Market ............ 26

        C.    The Complaint Properly Alleges that Defendants
            Conspired to Monopolize the California and Illinois EVR
            Market ........................................................ 28

        D.    MVSC Has Suffered Antitrust Injury ...................... 30

    IV.    MVSC HAS PLEADED ACTIONABLE VIOLATIONS OF
        CALIFORNIA'S UNFAIR COMPETITION LAW .................. 32

    V.    MVSC HAS PLEADED ACTIONABLE VIOLATIONS OF THE
        ILLINOIS CONSUMER FRAUD ACT .............................. 33

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF AUTHORITIES

Cases                                       Page

*Amarel v. Connell*,
   102 F.3d 1494 (9th Cir. 1996)...................................................................31

*American Needle, Inc. v. NFL*,
   560 U.S. 183 (2010) ....................................................................... 29, 30

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*,
   472 U.S. 585 (1985)...................................................................................24

*B&R Supermarket, Inc. v. Visa, Inc.*,
   No. C 16-01150, 2016 WL 5725010 (N.D. Cal. Sept. 30, 2016) ...........14

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) .........................................................10, 14, 19

*Byler v. Deluxe Corp.*,
   222 F. Supp. 3d 885 (S.D. Cal. 2016) ....................................................33

*Carpenter Tech. v. Allegheny Techs.*,
   646 F. Supp. 2d 726 (E.D. Pa. 2009) ....................................................29

*Cascade Health Sols. v. PeaceHealth*,
   515 F.3d 883 (9th Cir. 2008).....................................................................21

*Catch Curve, Inc. v. Venali, Inc.*,
   519 F. Supp. 2d 1028 (C.D. Cal. 2007)...................................................27

*Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*,
   20 Cal. 4th 163 (1999)...............................................................................33

*Chocolate Confectionary Antitrust Litig. In re*,
   801 F.3d 383 (3d Cir. 2015) ....................................................................18

*Coalition for ICANN Transparency, Inc. v. VeriSign, Inc.*,
   611 F.3d 495 (9th Cir. 2010).....................................................................19

*Copperweld Corp. v. Independence Tube Corp.*,
   467 U.S. 752 (1984) ....................................................................... 29, 30

*Credit Bureau Services, Inc. v. Experian Information Solutions, Inc.*,
   No. SACV 12–2146, 2013 WL 3337676 (C.D. Cal. June 28, 2013).....................16

*County of Tuolumne v. Sonora Cmty. Hosp.*,
   236 F.3d 1148 (9th Cir. 2001)...................................................................11

*Dolemba v. Illinois Farmers Ins. Co.*,
   No. 15 C 463, 2016 WL 5720377 (N.D. Ill. Sept. 30, 2016)...................33

*Domed Stadium Hotel, Inc. v. Holiday Inns, Inc.*,
   732 F.2d 480 (5th Cir. 1984)..................................................................28

*Evergreen Helicopters, Inc. v. Erickson Air-Crane Inc.*,
   Civ. No. 09–3059–PA, 2011 WL 285201 (D. Or. Jan. 26, 2011) ...................25, 26

*Financial & Sec. Prods. Ass'n v. Diebold, Inc., No. C*,
   04–04347, 2005 WL 1629813 (N.D. Cal. 2005) .................................................22

*Freeman v. San Diego Ass'n of Realtors*,
   322 F.3d 1133 (9th Cir. 2003)................................................................20

*Glen Holly Entm't, Inc. v. Tektronix, Inc.*,
   352 F.3d 367 (9th Cir. 2003).............................................................31, 32

*Gumwood HP Shopping Partners, L.P. v. Simon Property Group, Inc.*,
   No. 3:11–CV–268, 2013 WL 3214983 (N.D. Ind. 2013) ......................................22

*Hasbrouck v. Texaco, Inc.*,
   842 F.2d 1034 (9th Cir. 1988)................................................................31

*Helicopter Transp. Servs., Inc. v. Erickson Air-Crane Inc.*,
   No. CV 06–3077, 2008 WL 151833 (D. Or. Jan. 14, 2008)...............................24, 25

*High-Tech Emp. Antitrust Litig. In re*,
   856 F. Supp. 2d 1103 (N.D. Cal. 2012) ..............................................16, 17

*Illinois Brick Co. v. Illinois*,
   431 U.S. 720 (1977) ..........................................................................12

*Jurista v. Amerinox Processing, Inc.*,
   492 B.R. 707 (D.N.J. 2013)..................................................................12

*Kansas v. UtiliCorp United, Inc.*,
   497 U.S. 199 (1990) ..........................................................................12

*Kendall v. Visa U.S.A., Inc.*,
   518 F.3d 1042 (9th Cir. 2008)..........................................................16, 17

*Korea Supply Co. v. Lockheed Martin Corp.*,
   29 Cal. 4th 1134 (2003).....................................................................33

*Lenhoff Enters., Inc. v. United Talent Agency, Inc.*,
   No. CV 15–01086, 2015 WL 7008185 (C.D. Cal. Sept. 18, 2015).........................20

*Lithium Ion Batteries Antitrust Litig. In re*,
   No. 13–MD–2420–YGR, 2014 WL 309192 (N.D. Cal. Jan. 21, 2014) ................11

*LiveUniverse, Inc. v. MySpace, Inc.*,
   304 F. App'x 554 (9th Cir. 2008) .....................................................24, 25

*MetroNet Servs. Corp. v. Qwest Corp.*,
   383 F.3d 1124 (9th Cir. 2004)........................................................23, 24, 25

iii

*Monsanto Co. v. Spray-Rite Serv. Corp.*,
  465 U.S. 752 (1984) ................................................................................15-16

*Motorola, Inc. v. Pick*,
  No. CV 04–2655, 2004 WL 5472092 (C.D. Cal. June 22, 2004)..........................12

*Musical Instruments & Equip. Antitrust Litig., In re*,
  798 F.3d 1186 (9th Cir. 2015) ...................................................................... 14, 15

*name.space, Inc. v. Internet Corp. for Assigned Names & Numbers*,
  No. CV 12–8676, 2013 WL 2151478 (C.D. Cal. Mar. 4, 2013) ..........................26

*Newcal Indus. v. IKON Office*,
  *Sol.*, 513 F.3d 1038 (9th Cir. 2008) .................................................................27

*Nobody in Particular Presents, Inc. v. Clear Channel Commc'ns, Inc.*,
  311 F. Supp. 2d 1048 (D. Colo. 2004) ..............................................................21

*Orchard Supply Hardware LLC v. Home Depot USA, Inc.*,
  939 F. Supp. 2d 1002 (N.D. Cal. 2013) ..............................................................17

*Otter Tail Power Co. v. United States*,
  410 U.S. 366 (1973) ...........................................................................................24

*Packaged Ice Antitrust Litig. In re*,
  723 F. Supp. 2d 987 (E.D. Mich. 2010) ..............................................................18

*Packaged Seafood Prods. Antitrust Litig., In re*,
  No. 15-MD-2670-JLS, 2017 WL 35571 (S.D. Cal. Jan. 3, 2017) ........................13

*Paladin Assocs., Inc. v. Montana Power Co.*,
  328 F.3d 1145 (9th Cir. 2003)............................................................................28

*People ex rel. Fahner v. Hedrich*,
  108 Ill. App. 3d 83 (1982)..................................................................................33

*Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co., Inc.*,
  998 F.2d 1224 (3d Cir. 1993) ........................................................................17-18

*Plasma-Derivative Protein Therapies Antitrust Litig. In re*,
  764 F. Supp. 2d 991 (N.D. Ill. 2011) ..................................................................17

*Portney v. CIBA Vision Corp.*,
  593 F. Supp. 2d 1120 (C.D. Cal. 2008)...............................................................27

*QVC, Inc. v. Resultly, LLC*,
  159 F. Supp. 3d 576 (E.D. Pa. 2016) ..................................................................12

*Reading Intern., Inc. v. Oaktree Capital Mgmt. LLC*,
  317 F. Supp. 2d 301 (S.D.N.Y. 2003) .................................................................21

*RealPage, Inc. v. Yardi Sys., Inc.*,
  852 F. Supp. 2d 1215 (C.D. Cal. 2012)...............................................................28

*Rebel Oil Co. v. Atlantic Richfield Co.*,
  51 F.3d 1421 (9th Cir. 1995) ..................................................................26, 27, 28

*Safeway Inc. v. Abbott Labs.*,
  761 F. Supp. 2d 874 (N.D. Cal. 2011) ...................................................................25

*SEC v. Schooler*,
  No. 3:12–cv–2164, 2013 WL 3320364 (S.D. Cal. July 1, 2013)............................12

*Siegel v. Shell Oil Co.*,
  480 F. Supp. 2d 1034 (N.D. Ill. 2007) ...................................................................34

*Solyndra Residual Tr., by & through Neilson v. Suntech Power Holdings Co.*,
  62 F. Supp. 3d 1027 (N.D. Cal. 2014) ...................................................................31

*Spectrum Sports, Inc. v. McQuillan*,
  506 U.S. 447 (1993) ...............................................................................................31

*Starr v. Sony BMG Music Entm't*,
  592 F.3d 314 (2d Cir. 2010) ...................................................................................17

*Transpacific Passenger Air Transp. Antitrust Litig., In re*,
  No. C 07–05634, 2011 WL 1753738 (N.D. Cal. May 9, 2011) .............................16

*United Energy Trading, LLC v. Pacific Gas & Elec. Co.*,
  No. 15-cv-02383, 2016 WL 4203861 (N.D. Cal. Aug. 4, 2016) ...........................26

*United States v. Colgate & Co.*,
  250 U.S. 300 (1919) ...............................................................................................22

*United States v. Falstaff Brewing Corp.*,
  410 U.S. 526 (1973) ...............................................................................................19

*United States v. Griffith*,
  334 U.S. 100 (1948) ...............................................................................................22

*United States v. Grinnell Corp.*,
  384 U.S. 563 (1966) ...............................................................................................20

*Verisign, Inc. v. Internet Corp., No.*,
  CV 04–1292, 2004 WL 1945561 (C.D. Cal. May 18, 2004)................................31

*Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*,
  540 U.S. 398 (2004) ...............................................................................22, 23, 24, 25

*Vinci v. Waste Mgmt., Inc.*,
  80 F.3d 1372 (9th Cir. 1996) ..................................................................................13

*WellPoint, Inc. Out-of-Network UCR Rates Litig., In re*,
  865 F. Supp. 2d 1002 (C.D. Cal. 2011) ..................................................................16

*West Penn Allegheny Health Sys., Inc. v. UPMC*,
  627 F.3d 85 (3d Cir. 2010) ......................................................................................11

1

2

3 **STATUTES**

4 15 U.S.C. § 1 ................................................................................. *passim*

5 15 U.S.C. § 2 ................................................................................. *passim*

6 815 Ill. Comp. Stat. 505/1 *et seq.* ............................................................ 33

7 Cal. Bus. & Prof. Code § 17070 ............................................................ 33

8 Cal. Bus. & Prof. Code § 17200 ............................................................ 32

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MVSC'S CONSOLIDATED OPPOSITION
TO THE MOTIONS TO DISMISS OF REYNOLDS, CDK, AND CVR

1

## **INTRODUCTION**

Plaintiff Motor Vehicle Software Corporation ("MVSC") provides electronic vehicle registration and titling ("EVR") services, which allow automobile dealerships to provide new car buyers with vehicle registration, license plates, and title documents without a trip to the DMV.  To provide that service, MVSC requires information from the car dealer about the buyer, the vehicle, and any financing.  The data MVSC needs is stored on the Dealer Management System ("DMS") – the enterprise software used by all new car dealerships to manage their operations. MVSC, like other vendors that sell services to dealers, obtains such data from the dealer through an intermediary known as a data integrator.  Data integration services can be provided by the same company that provides the DMS service to the dealer or by third-party integrators that extract the needed data from the dealer's DMS with the dealer's authorization.

Defendants CDK and Reynolds are, by far, the two largest DMS providers in the United States, controlling at least 75 percent of the market, and they have held that dominant position for decades.  CDK and Reynolds also jointly own Defendant CVR, which provides EVR services in direct competition with MVSC.  Finally, CDK and Reynolds control access to dealer data stored on their systems through their own data integration products – CDK's data integration service is called Third Party Access ("3PA") and Reynolds's service is called Reynolds Certified Interface ("RCI").  *See id.* ¶ 88.

MVSC's First Amended Complaint ("Complaint") alleges that CDK and Reynolds unlawfully blocked MVSC from obtaining the dealer data it needs to provide EVR services by conspiring to (1) block all third-party integrators from accessing dealer data, thereby precluding independent integrators from providing the data to MVSC (or any other vendor), and (2) exclude MVSC from Defendants' own 3PA and RCI data integration programs.  The purpose of the conspiracy is simple:

by blocking MVSC's access to the required data, CDK and Reynolds seek to eliminate a formidable competitor to CVR, their wholly owned joint venture. Defendants' conduct supports claims under § 1 of the Sherman Act for unlawful conspiracy in restraint of trade; § 2 for unlawful monopolization, attempted monopolization, and conspiracy to monopolize; and state antitrust and unfair competition laws.

Defendants' motions to dismiss these claims should be denied because the Complaint properly alleges that CDK and Reynolds violated § 1 of the Sherman Act by unlawfully conspiring to deprive MVSC of dealer data, *see infra* Part I, and that Defendants violated § 2 of the Sherman Act by monopolizing the market for EVR services in Illinois (where CVR has close to 100 percent of the market) and attempting to do the same in California by the same illegal means, *see infra* Part II.

With respect to the § 1 claim, the United States District Court for the Western District of Wisconsin has already ruled – after a two-and-a-half day evidentiary hearing on a preliminary injunction motion – that CDK and Reynolds likely committed a per se violation of the Sherman Act by conspiring to exclude third-party data integrators from the market. *See* Opinion & Order, *Authenticom, Inc. v. CDK Global, LLC*, No. 17-cv-00318, 2017 WL 3017048 (W.D. Wis. July 14, 2017), ECF No. 172 ("Authenticom Order"), attached hereto as Exhibit 1. MVSC has antitrust standing to challenge that unlawful agreement as a direct purchaser of integration services. The Authenticom Order is dispositive here, where the Wisconsin federal court found that CDK and Reynolds have likely committed a per se antitrust violation under a much higher standard (for a preliminary injunction) than that which applies here (on a motion to dismiss), based on the same facts. Furthermore, the Complaint's allegations, including "when, who, and where" facts, provide more than sufficient factual support for the claim that CDK and Reynolds agreed to favor their own EVR provider (CVR) by excluding MVSC from their data access programs.

Indeed, executives from Defendants have *admitted* that CDK's and Reynolds's data access programs are "closed" to MVSC, that Defendants frequently discuss MVSC during board meetings for CVR, and that CDK and Reynolds executives at these board meetings are "very involved" and "very knowledgeable about MVSC and everything CVR was doing." Am. Compl. ¶¶ 100-01 (May 1, 2017), ECF No. 58; *see also id.* ¶¶ 10, 103. One CVR executive brazenly told MVSC: "I wish we would have asked for 85 percent of your revenue [as the price of admission for data access]. We don't want you in the program." *Id*. ¶¶ 11, 117. CVR actively markets itself as the "only" EVR provider in California and Illinois that is "certified" to participate in CDK's 3PA and Reynolds's RCI programs. *Id.* ¶¶ 144-46. CDK and Reynolds also threaten dealers that provide data to MVSC with breach of contract claims – under the theory that the DMS contract prohibits dealers from providing MVSC access to the dealer's own data. *Id*. ¶¶ 162-63. Defendants' motions to dismiss do not grapple with these – and many other – damaging allegations showing that CDK and Reynolds have conspired to block MVSC from obtaining the data needed to provide EVR services.

Each of the § 2 claims is likewise properly alleged. CVR monopolized the market for EVR services in Illinois and is attempting to monopolize the market in California, where CDK's and Reynolds's effective denial of dealer data to competitors and CVR's already substantial market share gives CVR a dangerous probability of success. As CVR's owners and controllers, CDK and Reynolds are equally liable under § 2. An unlawful restraint of trade – like the alleged agreement between CDK and Reynolds to deny dealer data to MVSC – constitutes anticompetitive conduct for purposes of § 2 when, as here, it leads to a monopoly or threat thereof. The conspiracy to monopolize claim is likewise properly pleaded, because CDK and Reynolds were acting as separate entities and not within the scope of the joint venture when they denied MVSC access to dealer data.

Defendants offer no independent reason to dismiss the state law antitrust claims; MVSC's state law unfair competition claims are independently viable in any event.  Accordingly, the motion should be denied in its entirety.

## BACKGROUND

### A.   Parties and Industry Background

**1.**     As an EVR provider, MVSC streamlines the process of issuing physical registration, license plates, and titles for vehicles sold at car dealerships.  *See* Am. Compl. ¶ 2.  In California, for example, car buyers need not wait in line at the DMV to get a new registration and license plate when they buy a new car.  MVSC does that automatically, corresponding with the DMV and mailing the registration and tags to new car owners within days.  *Id.* ¶ 47.

Defendants CDK and Reynolds are the two longstanding dominant providers of DMS services for car dealerships throughout the United States.  *Id.* ¶ 31.  The third defendant, CVR, is a joint venture of CDK and Reynolds; CVR is the largest EVR provider in the country and is MVSC's chief competitor in the California and Illinois EVR markets.  *Id.* ¶¶ 52-53.

The DMS is "enterprise software designed specifically for retail automotive dealership," *id.* ¶ 28, which is vital to virtually every business operation performed at car dealerships from sales and service to inventory and accounting.  Dealerships also store their data – including vehicle, customer, and sales information – on their DMS, which has a database component.  *Id.* ¶ 29.  Although that data is created and owned by the dealerships, *see, e.g.*, *id.* ¶ 85, CDK and Reynolds control who can access dealer data and thereby "can severely disrupt a dealership's business simply by switching off third-party access to essential data."  *Id.* ¶ 41.  Since CDK and Reynolds control 75 percent of the market when measured using franchised car dealerships (and even more if measured by vehicles sold), *id.* ¶ 31, they effectively control access to dealer data across most of the automotive industry.

**2.**      EVR providers – including MVSC and Defendant CVR – need access to that dealer data in order to provide their EVR services.  *Id.* ¶ 44.  Specifically, EVR providers need: (1) car buyer identification; (2) vehicle identification; and (3) financing information.  *Id.* ¶ 46.  That information is stored on the dealers' DMS database and nowhere else.  *Id*. ¶¶ 28-30.  If an EVR provider cannot access necessary dealer data on a reliable, consistent basis, it cannot compete.  *Id*. ¶¶ 44, 64.

To obtain dealer data, EVR providers (and other service vendors) rely on a data integrator, an entity that manages the flow of data from a dealer's DMS.  *Id.* ¶ 5.  In the past, MVSC was able to obtain dealer data through independent data integrators.  *Id.* ¶ 151.  But as discussed further below, Reynolds and CDK have blocked independent integrators from obtaining data stored on their DMS systems.  *Id.*  When independent data integration service is unavailable, vendors must obtain data through the data integration service provided by the DMS provider.  *See id.* ¶ 137.  CDK's and Reynolds's concerted refusal to allow MVSC to gain access to their 3PA and RCI programs is a central part of this lawsuit.

**3.**      EVR services are regulated on a state-by-state basis, including in California and Illinois.  *See id.* ¶¶ 60, 65-67.  In Illinois, CVR controls a 95 percent market share.  *See id.* ¶ 7.  MVSC has attempted to set up operations in Illinois, but, like all other EVR companies, it "cannot make any inroads into the market" because "CVR is the only EVR provider that is allowed direct access to CDK's and Reynolds's DMS."  *Id.* ¶ 62.  Direct access is essential to the provision of EVR services in Illinois because, under Illinois law, EVR providers must process and provide the car buyer with the registration and license plates at the time of sale – while the buyer is at the dealership finalizing the purchase.

MVSC has had more success in California.  Unlike Illinois, California does not require that the printed registration and license plates be provided to the car buyer at the time of sale; rather, California allows a 90-day window.  *See id.* ¶¶ 66,

70.  Thus, in the past, MVSC was "able to provide EVR services by obtaining the necessary data from a dealer's DMS at a later time through different means."  *Id.* ¶ 70.  Dealers have been willing to work with MVSC because they prefer MVSC's product and service.  *See id.* ¶¶ 73-78.  To take one example, it "takes CVR at least 30 days and sometimes as much as two months to deliver the physical registration and license plates to car buyers," while "MVSC accomplishes the same in one day." *Id.* ¶ 75.  Despite dealer preferences, the blockades that CDK and Reynolds have imposed on MVSC's access to dealer data have undermined MVSC's ability to compete in California.  *See id.* ¶¶ 160-65.

## B.    The CDK and Reynolds Horizontal Conspiracy

The Complaint alleges that CDK and Reynolds conspired to deny MVSC access to dealer data by blocking independent data integrators from providing dealer data to vendors –including EVR providers such as MVSC – and by refusing to allow MVSC to participate in the 3PA and RCI data integration programs.

*First*, CDK and Reynolds agreed not to compete with one another in providing data integration services and to block third-party data integrators from accessing dealer data on their respective DMS platforms.  *See id.* ¶ 122.

CDK and Reynolds entered into a written market-division agreement on February 18, 2015 ("2015 Agreement").  *See id.* ¶¶ 123-29.  The Complaint relies on a draft of the 2015 Agreement; the final, signed document – which is discussed in the Court's *Authenticom* opinion – also includes a provision under which CDK and Reynolds "agreed that they would not assist any person that attempts to access or integrate with the other party's DMS."  Authenticom Order at 7.  Under that provision – which never expires, *see id.* – CDK and Reynolds agreed to help insulate *each other's* DMS from competition by independent integrators.[1]

---

[1] The 2015 Agreement was introduced at the *Authenticom* hearing, but Defendants moved to keep the document under seal.  Therefore, MVSC relies on the allegations in its Complaint and the Court's description of the market-division agreement.

The Authenticom Order sets forth the key components of the 2015 Agreement. Up until the Agreement, CDK (through its subsidiary DMI) had competed against Reynolds and provided data integration services to dealers using the Reynolds DMS. In the Agreement, CDK "agreed to wind down" DMI's business among Reynolds dealers (accounting for roughly 30 percent of the market). Authenticom Order at 6. Reynolds, in turn, "agreed that it would not block" CDK's access "to the Reynolds system during the wind-down period, which might last as long as five years" (and is still continuing today). *Id.* at 6-7. As the Court further explained: "CDK agreed to cooperate with Reynolds to have DMI clients—vendors using DMI to poll data from the Reynolds system—transition to RCI, Reynolds's in-house 'data integrator.'" *Id.* at 7. "Defendants further agreed that they would not assist any person that attempts to access or integrate with the other party's DMS." *Id.* Thus, "[a]lthough the agreements do not explicitly state that defendants will work together to eliminate third-party data integrators, the agreements have that effect." *Id.* at 12.

Beyond the 2015 Agreement, MVSC's Complaint also alleges that high-ranking CDK and Reynolds executives admitted to Authenticom Founder and CEO Steve Cottrell that they had conspired to drive Authenticom and other independent integrators out of business. *See* Am. Compl. ¶¶ 133-36; *see also* Authenticom Order at 12 (specifically crediting Mr. Cottrell's testimony on these points).

***Second***, CDK and Reynolds agreed to block MVSC from receiving data integration directly from their 3PA and RCI programs. CDK and Reynolds thus "coordinated their actions and agreed that they both would reject MVSC from their third-party programs," *id.* ¶ 96, an agreement that was reached and implemented by high-ranking executives at the companies, *see id.* ¶¶ 97-99. "Based on information from a participant in the collusive conversations, CDK . . . has a name for the illegal conspiracy – the 'Closed Category.'" *Id.* ¶ 100. A "CDK executive . . . confirmed to a senior MVSC executive that CDK has agreed 'for a long time' to keep EVR as a

'closed category' within the 3PA program to keep MVSC out and to protect CVR." *Id.* ¶ 103.  The same CDK executive confirmed the identity of the executive at Reynolds (Robert Schaefer) who was blocking MVSC from the RCI program.  *Id.*  Perhaps most tellingly, during CVR board meetings attended by top CDK and Reynolds executives, MVSC was a recurring topic of conversation.  *Id.* ¶ 101.  As a former CVR board member admitted, Defendants' executives were "very involved" and "very knowledgeable about MVSC and everything CVR was doing."  *Id.*

CDK and Reynolds have enforced the agreement as planned.  *See id.* ¶ 104.  MVSC first applied to participate in CDK's 3PA program in February 2014, asking to pay standard rates for basic data.  *See id.* ¶ 105.  A month later, CDK rejected MVSC's application outright and without explanation.  *See id.*  After being prompted by multiple dealerships, *see id.* ¶¶ 106-14, MVSC repeatedly reapplied to participate in the CDK 3PA program.  In July 2015, MVSC's application was sent "up the chain" of command, where it was rejected outright again, this time with the explanation that "MVSC was a competitor to CVR, and it was therefore unlikely that MVSC would ever be allowed to participate in the program."  *Id.* ¶ 110.  CDK later modified its flat rejection and instead demanded rates it knew MVSC could not accept:  from 25 to 33 percent of MVSC's top-line revenues.  *See id.* ¶¶ 111-13.

Reynolds similarly denied MVSC access to its RCI program at the same time. When MVSC first applied, in early 2014, Reynolds demanded proprietary information about MVSC's business and then ultimately "came back with a price quote that translated into a huge percentage of MVSC's top-line revenues, similar to CDK's demand."  *Id.* ¶ 115.  As it did with CDK, MVSC reapplied at the urging of dealers, but Reynolds's exorbitant price demands grew even steeper in subsequent iterations.  *See id.* ¶ 116.  At an industry conference in 2016, an MVSC executive complained to a CVR executive about how absurd the quoted rates were.  In

MVSC'S CONSOLIDATED OPPOSITION
TO THE MOTIONS TO DISMISS OF REYNOLDS, CDK, AND CVR

1   response, the CVR executive stated:  "I wish we would have asked for 85 percent of

2   your revenue.  We don't want you in the program."  *Id.* ¶¶ 11, 117.

3          Having been blocked from using independent integrators and from

4   participating in the 3PA and RCI programs, "MVSC has one last option for obtaining

5   data from a dealer's DMS" in California: a manual process that requires the dealer to

6   pull the data every day.  *Id.* ¶ 159.  But this is a time-intensive and inefficient process

7   that few dealers are happy with, and, in any event, CDK and Reynolds have begun to

8   cut off and disable the manual process as well, including threatening dealers that do

9   business with MVSC with breach of contract.  *See id.* ¶¶ 160-65.

10          **C.     Harm to MVSC and Competition**

11          Defendants' efforts to block MVSC's access to dealer data is having its

12   intended effect.  In Illinois, CVR has cemented its near total monopoly, while in

13   California MVSC is losing customers.  *See Id.* ¶ ¶ 138-44.  In both, dealers are

14   deprived of their preferred choice in EVR provider, being forced to use CVR despite

15   its inferior services and to pay a higher quality-adjusted price for EVR services.  *See*

16   *Id.* ¶¶ 164-65, 172-176.  Meanwhile, CDK and Reynolds have spread misinformation

17   about MVSC and used strong-arm tactics to get dealers to switch from MVSC to

18   CVR.  *See id.* ¶¶ 167-69.  "Unfortunately, for many dealers, the campaign by CDK

19   and Reynolds to cut off MVSC and then convert dealerships to CVR" is working.

20   *Id.* ¶ 172.  Indeed, even though MVSC is widely recognized for its superior service

21   and product, many dealers have reluctantly switched to CVR because of the blocking

22   tactics of CDK and Reynolds.  *See id.* ¶¶ 174-76.

23          **D.     The Authenticom Lawsuit and Preliminary Injunction**

24          Following the filing of this action, Authenticom – the last remaining third-

25   party data integrator in the automotive industry – filed an antitrust suit against CDK

26   and Reynolds in the United States District Court, Western District of Wisconsin.  On

27   May 18, 2017, Authenticom moved for a preliminary injunction.  After a two-and-

28

MVSC'S CONSOLIDATED OPPOSITION
TO THE MOTIONS TO DISMISS OF REYNOLDS, CDK, AND CVR

half-day hearing – involving more than a dozen witnesses, including six experts – the Court granted Authenticom's motion.  *See* Authenticom Order at 6-10, 13, 22.

As most relevant here, the Court found that Authenticom had made the requisite likelihood of success showing on its claim that CDK and Reynolds had conspired in violation of § 1 of the Sherman Act.  Based on the same evidence supporting the allegations in MVSC's Complaint, the Court found that Authenticom had "adduced evidence that could establish the existence of a per se illegal horizontal conspiracy" between CDK and Reynolds to block independent integrators. Authenticom Order at 12; *see also id.* at 15-16.  The Court based this finding on the same conduct alleged in MVSC's Complaint.  *See id.* at 12, 15-16; *see also* Am. Compl. ¶¶ 122-137.  For example, the Court found that the "February 2015 agreements between CDK and Reynolds . . . suggest a horizontal conspiracy." Authenticom Order at 12.  In addition, the Court found the testimony of Mr. Cottrell, regarding statements by executives of CDK and Reynolds that they had "agreed to drive Authenticom from the market," to be credible.  *Id.*

In granting Authenticom's motion for preliminary injunction, the Court also rejected Defendants' argument that providing access to third-party integrators would either create security risks or burden the DMS.  *See*, *e.g.*, *id.* at 20.

<u>**ARGUMENT**</u>

**I.    MVSC Has Alleged an Unlawful Conspiracy Under § 1**

MVSC's Complaint pleads "enough factual matter (taken as true) to suggest that an agreement was made" between CDK and Reynolds in restraint of trade.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007).  CDK and Reynolds agreed in writing to divide the data integration market between themselves, and to cooperate to destroy independent data integrators.  In doing so, the Defendants "cut off MVSC's access to obtain the necessary dealer data by other means," Am. Compl. ¶ 195, leaving MVSC with no alternate method of accessing data when faced with

Defendants' group boycott.  CDK's and Reynolds's agreement to block independent integrators – including the written 2015 Agreement to that effect – has already been recognized by one federal court as a likely per se § 1 violation.  MVSC has standing to challenge such an agreement as a direct purchaser of data integration services. Furthermore, MVSC has pleaded detailed factual allegations to support the claim that CDK and Reynolds further agreed to deny MVSC's repeated requests to obtain dealer data directly from Defendants through their certified integration programs.

### A.    The Agreement to Block Independent Integrators

MVSC has alleged that CDK and Reynolds entered into an agreement to exclude third-party integrators from the market, as evidenced by their 2015 Agreement and the statements of their executives.  *See* Am. Compl. ¶¶ 122-137.  "If a complaint includes non-conclusory allegations of direct evidence of an agreement, a court need go no further on the question whether an agreement has been adequately pled."  *West Penn Allegheny Health Sys., Inc. v. UPMC*, 627 F.3d 85, 99 (3d Cir. 2010); *see also Cty. of Tuolumne v. Sonora Cmty. Hosp.*, 236 F.3d 1148, 1155 (9th Cir. 2001) ("A claim will survive a motion for *summary judgment* if there is direct evidence of a conspiracy.") (emphasis added); *In re Lithium Ion Batteries Antitrust Litig.*, No. 13–MD–2420, 2014 WL 309192, at *2 (N.D. Cal. Jan. 21, 2014) (Stating that because a complaint contained "specific allegations of not only opportunities to collude, but certain defendants' actual agreements . . . , [t]he question in this case is not whether any conspiracy existed, only how far it reached.").

After hearing extensive evidence in line with the Complaint's allegations here, the federal court in Wisconsin held that those facts are likely to "establish the existence of a per se illegal horizontal conspiracy."  Authenticom Order at 12; *see also id.* at 16.  Because the allegations and evidence of horizontal conspiracy were sufficient to merit preliminary injunctive relief, they necessarily are sufficient to survive a motion to dismiss.  As courts have observed, "the standard for obtaining

11

injunctive relief is considerably higher than the standard for surviving dismissal [under Rule 12(b)(6)]." *Jurista v. Amerinox Processing, Inc.*, 492 B.R. 707, 778 (D.N.J. 2013); *see also Motorola, Inc. v. Pick*, No. CV 04–2655, 2004 WL 5472092, at *3 (C.D. Cal. June 22, 2004) (denying motion to dismiss following a grant of preliminary injunction on the basis that plaintiff "easily met the less stringent burden of Rule 12(b)(6) . . . [h]aving met its burden on its motion for preliminary injunction");  *SEC v. Schooler*, No. 3:12–cv–2164, 2013 WL 3320364, at *4 (S.D. Cal. July 1, 2013) ("Furthermore, having already obtained a preliminary injunction, the SEC has presumptively met its burden under Rule 12(b)(6)."); *QVC, Inc. v. Resultly, LLC*, 159 F. Supp. 3d 576, 594 (E.D. Pa. 2016) (same).  In short, MVSC's allegations with respect to Defendants' agreement to block independent integrators are sufficient to sustain its § 1 claim.

CDK and Reynolds make little attempt to justify their agreement to block third-party integrators.  Instead, they argue primarily that MVSC lacks standing to challenge that aspect of the conspiracy because MVSC does not provide data integration services.  *See* Memorandum in Support of Reynolds Motion to Dismiss, at 15-16 (June 15, 2017), ECF No. 63-1 ("Reynolds Br."); Memorandum in Support of CDK Motion to Dismiss, at 19-20 (June 15, 2017), ECF No. 61-1 ("CDK Br."). But, as a purchaser of data integration services – including services provided by third-party integrators – MVSC has standing to challenge this facet of the conspiracy as a *consumer*.  *See* Am. Compl. ¶¶ 151-58 (detailing that MVSC has purchased data integration services from a variety of providers).  Consumers – especially "direct purchasers" of data integration services like MVSC – have standing to sue under the Sherman Act.  *See Kansas v. UtiliCorp United, Inc.*, 497 U.S. 199, 207 (1990) ("immediate buyers from the alleged antitrust violators" have standing); *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 745-46 (1977) (same).  Defendants' own citations confirm that "a consumer in the relevant market" has antitrust standing.  *Vinci v.*

*Waste Mgmt., Inc.*, 80 F.3d 1372, 1376 (9th Cir. 1996).  Indeed, MVSC was a customer of Authenticom's (and other third-party integrators) until Defendants successfully implemented their agreement to block third-party integrators.  *See* Am. Compl. ¶¶ 152-58.  In short, by denying third-party integrators access to dealer data stored on their respective DMSs, CDK and Reynolds restricted MVSC's ability to purchase data integration services, foreclosing data integration through any means other than CDK's and Reynolds's own 3PA and RCI programs.  *See id.* ¶ 195.[2]

CDK and Reynolds also assert that their concerted effort to block independent integrators does not support an inference of an unlawful conspiracy, because each one could have decided to block independent integrators unilaterally.  *See* CDK Br. at 17-19; Reynolds Br. at 16-19.  Defendants made the same argument in the *Authenticom* litigation, and the Court rejected it.  The Court found that the evidence at the hearing (which, again, corresponds to the Complaint's allegations) was "sufficient to suggest more than merely parallel conduct by independent firms." Authenticom Order at 14; *see also In re Packaged Seafood Prods. Antitrust Litig.*, No. 15-MD-2670-JLS, 2017 WL 35571, at *11 n.9 (S.D. Cal. Jan. 3, 2017) (distinguishing cases involving "allegations of mere parallel conduct" because "Plaintiffs in the present case have presented allegations of . . . specific horizontal agreements").  Whatever CDK and Reynolds might have been able to achieve unilaterally, an agreement to exclude third-party integrators is per se unlawful – a legal point that Defendants do not contest.

---

[2] The conspiracy has allowed CDK and Reynolds to raise integration prices across the board on all vendors.  For example, at the Authenticom preliminary injunction hearing:

> Alan Andreu, testified that when his software company, Dominion, first began using RCI in 2011, it was paying $247 per month per dealer.  Come September 2017, that same data package will cost $893.  Andreu also testified that Dominion was paying $457 per dealership for 3PA, CDK's integration service. Dkt. 165, at 39:1-3 ("So compared to Reynolds' 893, it's cheap—it's only $457—until you compare it to that $30 that I could have paid Authenticom.").

Authenticom Order at 9.

MVSC'S CONSOLIDATED OPPOSITION
TO THE MOTIONS TO DISMISS OF REYNOLDS, CDK, AND CVR

Furthermore, by acting in concert, CDK and Reynolds were able to achieve business objectives they could not achieve unilaterally. For example, the 2015 Agreement enabled CDK and Reynolds to coordinate their business strategies with respect to blocking independent integrators from accessing dealer data. CDK did not begin blocking independent integrators in earnest until several years after Reynolds, *see* Am. Compl. ¶¶ 152-56, which was a dramatic departure from CDK's longstanding and public position "that dealerships own their data and enjoy having choices on how best to share and utilize that data with others," *id.* ¶ 85. The 2015 Agreement gave CDK assurance that it could replicate Reynolds's blocking tactics without fear of Reynolds changing its own policies. In return, Reynolds no longer had to contend with CDK competing against it for data integration services to Reynolds dealers. Reynolds also benefited from CDK's assistance in transitioning vendors to Reynolds. These benefits would not have been achieved in the same way absent an express agreement.

## B.   The Agreement to Block MVSC From the 3PA and RCI Programs

The Complaint also alleges facts to demonstrate that CDK and Reynolds agreed to deny MVSC access to 3PA and RCI integration services, which was an additional aspect of their unlawful conspiracy. "An impermissible conspiracy can be alleged through either direct or circumstantial evidence." *B&R Supermarket, Inc. v. Visa, Inc.*, No. C 16-01150, 2016 WL 5725010, at *6 (N.D. Cal. Sept. 30, 2016) (citing *In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1193 (9th Cir. 2015)). And while "parallel conduct – without more – 'does not suggest conspiracy,'" plaintiffs properly plead a § 1 violation if they "allege sufficient facts regarding the context of the parallel conduct to raise a suggestion of outright collusion." *Id.* at *5 (quoting *Twombly*, 550 U.S. at 556-57) (citing *In re Musical Instruments*, 798 F.3d at 1194). Instead of evaluating the allegations in isolation, Defendants' actions must be assessed "in turn and cumulatively to determine

whether plaintiffs have alleged non-conclusory facts sufficient to state a claim under § 1." *In re Musical Instruments*, 798 F.3d at 1194.

MVSC's allegations raise more than a plausible inference that CDK's and Reynolds's refusal to allow MVSC to access data through their 3PA and RCI programs resulted from an agreement rather than unilateral action. CDK and Reynolds had both a strong common motive to conspire – namely to promote their joint venture, CVR, at the expense of its competitor MVSC – and ample opportunity to do so. Am. Compl. ¶¶ 101-02. Defendants seized such opportunities at CVR board meetings, where MVSC "was a recurring topic of conversation" and where CDK and Reynolds executives were "very involved" and "very knowledgeable about MVSC and everything CVR was doing." *Id.* ¶ 101. With the shared motive of protecting their joint venture from competition, both CDK and Reynolds repeatedly denied MVSC's requests to access data through their RCI and 3PA programs. *Id.* ¶¶ 105-116. After outright rejections, these denials even took the same form: exorbitant price quotes, directly from Defendants' "highest level of governance." *Id.* ¶ 111; *see also* ¶¶ 109-116. A CVR executive admitted the price quotes were not meant as serious offers and that Defendants simply did not want MVSC "in the program." *Id.* ¶¶ 11, 117. After CDK and Reynolds rejected MVSC from their programs, they subsequently targeted MVSC's dealer-customers to convince them to switch to CVR and threatened them with breach-of-contract claims for sending data to MVSC. *Id.* ¶ 163-171.

All of this gives rise to a reasonable inference that the decision to deny MVSC access to the 3PA and RCI programs reflected CDK's and Reynolds's "conscious commitment to a common scheme designed to achieve an unlawful objective," not independent business judgments. *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984). That is especially true when viewing these allegations "as a whole, and not on a piecemeal basis." *In re Transpacific Passenger Air Transp. Antitrust*

---

*Litig.*, No. C 07–05634, 2011 WL 1753738, at *10 (N.D. Cal. May 9, 2011); *see also In re High-Tech Emp. Antitrust Litig.*, 856 F. Supp. 2d at 1118 ("[T]he character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole.").

Additionally, MVSC has identified numerous factual circumstances that further support the conclusion that Defendants acted in concert.

*First*, MVSC has alleged specifics about the venue, timing, and participants of the alleged conspiracy.  MVSC alleges, *inter alia*, that the agreement was made at least in part at CVR's board meetings; that the key conspirators were Scott Herbers from CVR, (formerly of Reynolds and CDK), Robert Schaefer from Reynolds[3], and Robert Karp from CDK; and that the agreement was entered into, at the latest, in January 2014.  *See* Am. Compl. ¶¶ 95-101.[4]  These allegations "give a defendant seeking to respond to allegations of a conspiracy an idea of where to begin," which is what is required at the pleading stage.  *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1047 (9th Cir. 2008); *see also In re WellPoint, Inc. Out-of-Network UCR Rates Litig.*, 865 F. Supp. 2d 1002, 1026 (C.D. Cal. 2011) (noting the importance of plaintiff's allegation that defendants "had ample opportunities to communicate . . . among themselves about the conspiracy").

Despite these detailed allegations, Defendants fault the Complaint for not identifying the exact communications where the group boycott was agreed to, *see*

_____

[3] Mr. Schaefer is a central figure in the overall conspiracy – as he admitted to Mr. Cottrell that CDK and Reynolds had agreed to drive Authenticom out of business.  At the preliminary injunction hearing, both Mr. Schaefer and Mr. Cottrell testified.  The Court dismissed Mr. Schaefer's denials as "conclusory," while he credited Mr. Cottrell's account because it was "detailed and thus more persuasive."  Authenticom Order at 12.

[4] MVSC's allegations are far more detailed and specific than those in the cases cited by Defendants.  For example, in *Credit Bureau Services, Inc. v. Experian Information Solutions, Inc.*, No. SACV 12–2146, 2013 WL 3337676, at *8 (C.D. Cal. June 28, 2013), "[n]one of the factual allegations demonstrate[d] that anyone at CoreLogic . . . was in the same room as anyone at Experian."  By contrast, MVSC has alleged that CDK and Reynolds executives met regularly at CVR's board meetings, as well as to negotiate the 2015 Agreement.  *See* Am. Compl. ¶¶ 55, 95-101, 123.

Reynolds Br. at 11 (citing *Kendall*, 518 F.3d at 1048), even though the Complaint specifically alleges that the Defendants conspired at CVR board meetings.  Even so, courts "do[] not hold . . . that a complaint alleging an unlawful group boycott must allege specific communications amongst conspirators, and provide evidentiary support for that allegation."  *Orchard Supply Hardware LLC v. Home Depot USA, Inc.*, 939 F. Supp. 2d 1002, 1009 (N.D. Cal. 2013); *see also Starr v. Sony BMG Music Entm't*, 592 F.3d 314, 325 (2d Cir. 2010) ("Defendants next argue that *Twombly* requires that a plaintiff identify the specific time, place, or person related to each conspiracy allegation.  This is also incorrect.").  Defendants' framing of the conspiracy pleading requirement also over-interprets *Kendall* itself.  *See, e.g.*, *In re High-Tech Employee*, 856 F. Supp. 2d at 1116 (noting that "[e]ven after conducting depositions, the plaintiffs in *Kendall* did 'not allege *any* facts to support their theory that the [defendants] conspired or agreed with each other . . . to restrain trade'") (quoting *Kendall*, 518 F.3d at 1048).

    ***Second***, the conspiracy occurred in a market that is highly consolidated and where dealers are required by law to use EVR providers.  *See In re Plasma-Derivative Protein Therapies Antitrust Litig.*, 764 F. Supp. 2d 991, 1002 (N.D. Ill. 2011) (holding that an industry was "ripe for collusion" because "[t]he industry was highly consolidated, with only a handful of firms, making coordination easier" and "the demand for the product is highly inelastic because there are no good substitutes").  Moreover, through their common ownership and management of CVR, CDK and Reynolds are able to monitor compliance with the agreement to deny MVSC access to dealer data.  *See* Am. Compl. ¶¶ 35-43; *see also Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co., Inc.*, 998 F.2d 1224, 1233 (3d Cir. 1993) ("Game theory teaches us that a cartel cannot survive absent some enforcement mechanism because otherwise the incentives to cheat are too great.").

**Third**, the fact that Defendants also agreed to block third-party integrators reinforces the inference that CDK's and Reynolds's boycott of MVSC does not reflect mere unilateral conduct.  The agreement to block third-party integrators – which came after the initial rejections by CDK and Reynolds of MVSC from the 3PA and RCI programs – more effectively prevented competition by MVSC.  *Cf.* Areeda & Hovenkamp ¶ 1421a ("[I]f there is other evidence of a present conspiracy, the defendants' sins elsewhere may cast doubt on the truthfulness of their innocent explanations.").

To the extent Defendants argue that blocking third-party integrators affects a different market (that is, the market for integration services) than boycotting MVSC (which affects the market for EVR services), that argument carries little weight. When "two markets are sufficiently similar or adjacent and the relevant activities therein are sufficiently linked or tied in some way," an unlawful agreement in the first market may well "support [the] inference" of a conspiracy in the second.  *In re Chocolate Confectionary Antitrust Litig.*, 801 F.3d 383, 403 (3d Cir. 2015).[5]  The EVR application market is closely related to – and, in fact, dependent on – data integration.  MVSC and all other EVR vendors rely on data integration to provide their services, *see* Am. Compl. ¶ 41, and thus the per se illegal agreement to block independent integrators has direct anticompetitive effects on EVR vendors, including MVSC.

**Finally**, CDK's and Reynolds's integration policies with respect to EVR providers that do *not* compete with CVR further supports an inference of concerted action.  In Texas, where CVR does not operate, the local EVR provider – AIB, Inc. – is allowed to participate in the 3PA and RCI programs.  *See id.* ¶ 119.  But in the

---

[5] *See also, e.g.*, *In re Packaged Ice Antitrust Litig.*, 723 F. Supp. 2d 987, 1011 (E.D. Mich. 2010) ("[U]nder certain circumstances, the 'if there, then here,' argument certainly can have merit.  Particularly where, as here, there is a significant overlap in identity of interest of the alleged co-conspirators in both markets.").

MVSC'S CONSOLIDATED OPPOSITION
TO THE MOTIONS TO DISMISS OF REYNOLDS, CDK, AND CVR

California and Illinois EVR markets, where MVSC and CVR compete head-to-head, CVR is the *only* EVR provider allowed to participate in the 3PA and RCI programs. *See id.* ¶ 120.  Moreover, "other DMS providers – the ones that do not own CVR – allow MVSC to participate in their [data integration] programs."  *Id.* ¶ 121.  It is only CDK and Reynolds – the owners of CVR – that refuse to allow MVSC to participate. These facts strengthen the inference that the group boycott of MVSC by CDK and Reynolds was the result of an agreement.

* * * * *

MVSC alleges extensive direct and circumstantial evidence – "the lifeblood of antitrust law," *United States v. Falstaff Brewing Corp.*, 410 U.S. 526, 534 n.13 (1973) – that "tend[s] to exclude the possibility" that CDK's and Reynolds's restrictions on MVSC's access to dealer data are independent (rather than concerted) acts, *Twombly*, 550 U.S. at 554.  Because MVSC has provided factual allegations to support the inference of conspiracy and not just the "naked assertion of conspiracy" held inadequate in *Twombly*, its group-boycott claim should survive Defendants' motions to dismiss.  550 U.S. at 557.

## II.   MVSC Has Alleged Unlawful Monopolization and Attempted Monopolization

### A.   MVSC Adequately Pleads That Defendants Monopolized The Illinois EVR Market

To establish a Sherman Act § 2 violation for monopolization, MVSC must allege:  (1) "the possession of monopoly power in the relevant market"; and (2) "the acquisition or perpetuation of [that] power by illegitimate 'predatory' practices."  *See Coalition for ICANN Transparency, Inc. v. VeriSign, Inc.*, 611 F.3d 495, 506 (9th Cir. 2010) (citation omitted).  MVSC has sufficiently alleged both elements.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### 1.   Defendants Have Monopoly Power in Illinois Through A Single Entity, CVR

Monopoly power is "the power to control prices or exclude competition," and it "may be inferred from [a company's] predominant share of the market." *United States v. Grinnell Corp.*, 384 U.S. 563, 571 (1966). CVR has over 95 percent market share in the Illinois EVR market – which is sufficient to allege (and to provide at least *prima facie* evidence of) monopoly power. *See* Am. Compl. ¶ 138; *see also Grinnell Corp.*, 384 U.S. at 571 (market share of over 80 percent warranted inference of market power).

Defendants do not dispute that CVR has achieved near total dominance of the Illinois EVR market. Instead, CDK and Reynolds argue that under § 2, a theory of "shared monopoly" is not cognizable; they note that a monopoly must consist of a single firm. *See* CDK Br. at 12, 15; Reynolds Br. at 13. But MVSC makes no allegation of shared monopoly. Rather, in the Illinois EVR market, Defendants have unlawfully created a monopoly in a single entity: CVR. *See, e.g.*, *Lenhoff Enters., Inc. v. United Talent Agency, Inc.*, No. CV 15–01086, 2015 WL 7008185, at *4 (C.D. Cal. Sept. 18, 2015) ("Ninth Circuit case law holds that to sufficiently state a claim under § 2 … the plaintiff must allege facts indicating that a conspiracy exists to create a monopoly in a single entity.").

Reynolds argues it cannot monopolize the Illinois EVR market because "it does not participate" in that market. Reynolds Br. at 14; *see also id.* 14-16. But the Complaint makes clear that CVR is a joint venture of CDK and Reynolds. *See* Am. Compl. ¶ 55. Accordingly, Reynolds, CDK, and CVR are jointly and severally liable for any violation of the antitrust laws, including monopolization of the EVR market in Illinois. Although Reynolds owns a 20 percent share of CVR (as compared to 80 percent ownership stake for CDK), *see id.* ¶ 21, this does not affect its liability as a joint venturer. *See Freeman v. San Diego Ass'n of Realtors*, 322 F.3d 1133, 1148

20

(9th Cir. 2003) ("[w]here there is substantial common ownership . . . or an agreement to divide profits and losses, individual firms function as an economic unit and are generally treated as a single entity").  Nor does a minority share preclude Reynolds from exercising the type of "substantial control" of a subsidiary necessary for antitrust liability in the subsidiary's market.  *Nobody in Particular Presents, Inc. v. Clear Channel Commc'ns, Inc.*, 311 F. Supp. 2d 1048, 1070 (D. Colo. 2004) ("[A] parent can be considered a competitor in a market where its subsidiary is a participant if … the parent sufficiently controls, dictates, or encourages the policies of the subsidiary."); *Reading Intern., Inc. v. Oaktree Capital Mgmt. LLC*, 317 F. Supp. 2d 301, 325 (S.D.N.Y. 2003) (whether 17 percent owner of subsidiary exercised "such control … [was] a fact-specific inquiry hinging on the particular structure and dynamics of the two entities" that "must await a hearing on the merits").  Such control is alleged here.  *See* Am. Compl. ¶¶ 55, 141, 205, 213, 223.

## 2. Defendants Acquired and Maintain Their Monopoly in Illinois Through Exclusionary Practices

MVSC also has sufficiently alleged that Defendants have acquired and maintained their monopoly in the Illinois EVR market through exclusionary or anticompetitive means.  "Anti-competitive conduct is behavior that tends to impair the opportunities of rivals and either does not further competition on the merits or does so in an unnecessarily restrictive way."  *Cascade Health Sols. v. PeaceHealth*, 515 F.3d 883, 894 (9th Cir. 2008).  MVSC alleges that Defendants have frustrated competition in the Illinois EVR market by denying MVSC access to dealer data. Whether that conduct was pursuant to an agreement between CDK and Reynolds, as alleged, or the result of unilateral conduct by CDK and Reynolds, it supports a claim under § 2 for unlawful monopolization.

**a.** To the extent that CDK and Reynolds agreed to restrict MVSC's access to dealer data – by eliminating independent integrators and refusing to permit MVSC

to participate in the 3PA and RCI programs – such an unlawful horizontal agreement also constitutes exclusionary conduct for § 2 purposes. *See, e.g.*, *Financial & Sec. Prods. Ass'n v. Diebold, Inc.*, No. C 04–04347, 2005 WL 1629813, at *4 (N.D. Cal. 2005) (Defendant violates "Section 2 of the Sherman Act . . . [if he] 'has acquired or maintained his strategic position, or sought to expand his monopoly, or expanded it by means of those restraints of trade which are cognizable under [Section] 1.'") (quoting *United States v. Griffith*, 334 U.S. 100, 106 (1948)); *Gumwood HP Shopping Partners, L.P. v. Simon Property Group, Inc.*, No. 3:11–CV–268, 2013 WL 3214983, at *7 (N.D. Ind. 2013) ("Where defendant has engaged in unlawful restraint of trade that would independently violate Section 1 of the Sherman Antitrust Act, it is well established that it also violates Section 2 if it acquires or maintains a monopoly by means of that restraint of trade.").

   **b.**     Even absent the conspiracy, the Complaint's refusal-to-deal allegations satisfy the standards for pleading exclusionary conduct because the Complaint alleges that the CDK and Reynolds refused to sell to a competitor – MVSC – integration services that they voluntarily sell to non-competing service vendors to create and preserve a monopoly.  To be sure, "as a general matter, the Sherman Act 'does not restrict the long recognized right of [a] trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal.'"  *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 408 (2004) (quoting *United States v. Colgate & Co.,* 250 U.S. 300, 307 (1919)).  At the same time, "[t]he high value that we have placed on the right to refuse to deal with other firms does not mean that the right is unqualified."  *Id.*

   The Complaint's allegations, if proven, would allow a fact-finder to conclude that defendants' refusal to deal was motivated "not by competitive zeal but by anticompetitive malice" against MVSC as a competing EVR provider.  *Id.* at 409.

1   As the Complaint alleges, both CDK and Reynolds voluntarily sell integration

2   services to vendors, at a significant profit.  *See* Am. Compl. ¶ 87; *see also*

3   Authenticom Order at 14 ("data integration revenue per dealer is nearly the equal of

4   the base cost of the DMS itself").  Defendants, however, refuse to sell integration

5   services to MVSC because it is a competitor of CVR.  *See* Am. Compl. ¶ 11.  A

6   refusal "to sell [generally available products] to the plaintiff '*even if compensated at*

7   *retail price*'" suggests "'a calculation that its future monopoly retail price would be

8   higher.'"  *MetroNet Servs. Corp. v. Qwest Corp.,* 383 F.3d 1124, 1132 (9th Cir.

9   2004) (quoting *Trinko*, 540 U.S. at 409).  That is why a refusal "to provide to . . .

10   competitors products that [are] already sold [by defendants] in a retail market to

11   other customers" may support a claim under § 2.  *Id.* at 1133.  And that is what

12   MVSC alleges.

13        CDK and Reynolds attempt to argue that MVSC has failed to allege an

14   anticompetitive refusal to deal, because CDK and Reynolds did not terminate a pre-

15   existing business relationship with MVSC.  *See* CDK Br. at 16-19; Reynolds Br. at

16   17-19.  But CDK and Reynolds have sold data integration services to a variety of

17   vendors in the automotive industry, including AIB, an EVR provider.  CDK offers

18   integration at rates it publishes online.  *See* Am. Compl. ¶¶ 92, 114.  While Reynolds

19   does not publish its rates, MVSC has alleged that RCI is made available at

20   reasonable rates to other EVR providers that do not compete with CVR.  *See id.* ¶¶

21   93, 119.  The Complaint also alleges that Defendants refused to extend those

22   generally available terms to MVSC to undermine MVSC's ability to compete with

23   CVR.  *See id.* ¶¶ 104-17.  Defendants' practice of selling integration services to other

24   vendors supports an allegation that the refusal to sell to MVSC is unlawfully

25   exclusionary – whether or not CDK and Reynolds made any prior sales to MVSC

26   specifically.  *See MetroNet*, 383 F.3d at 1132-33 (a "refusal to sell to the plaintiff at

27   the prevailing retail price" – like "the unilateral termination of a prior profitable

28

course of dealing" – could "indicate[] a willingness to sacrifice short-term benefits in order to obtain higher profits in the long run from the exclusion of competition"); *see also Helicopter Transp. Servs., Inc. v. Erickson Air-Crane Inc.*, No. CV 06–3077, 2008 WL 151833, at *9 (D. Or. Jan. 14, 2008) ("The Supreme Court has never held that termination of a preexisting course of dealing is a necessary element of an antitrust claim.").

In *Otter Tail Power Co. v. United States*, 410 U.S. 366 (1973), for example, the Supreme Court found that defendant Otter Tail was liable under § 2 for its refusal to sell power transmission to newly established, competing municipal power providers – even though Otter Tail never sold power to the plaintiff specifically. *See id.* at 370-72, 377-78. The Court reasoned that Otter Tail generally sold transmission services to non-competing wholesale customers, and so its refusals to sell the same services to the plaintiff were designed to "prevent municipal power systems from eroding its monopolistic position." *Id.* at 378. It was on this basis that the *Trinko* Court distinguished *Otter Tail*, noting that "the defendant was already in the business of providing a service to certain customers . . . , and refused to provide the same service to certain other customers." 540 U.S. at 410; *see also id.* (distinguishing *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985), on the basis that "what the defendant refused to provide to its competitor was a product that it already sold at retail").

Defendants rely on the unpublished opinion in *LiveUniverse, Inc. v. MySpace, Inc.*, 304 F. App'x 554, 556-58 (9th Cir. 2008), but that case does not support Defendants' argument. The *LiveUniverse* Court cited *MetroNet* for the proposition that "the refusal to deal exception, . . . requires, *inter alia*, 'the unilateral termination of a voluntary and profitable course of dealing.'" 304 Fed. App'x at 556 (quoting *MetroNet*, 383 F.3d at 1132). But in *LiveUniverse* there was no relevant service provided to third parties analogous to the integration services that CDK and

24

Reynolds provide to vendors.  *Compare LiveUniverse*, 304 F. App'x at 557, *with* Am. Compl. ¶¶ 88-94, 119.  Without any allegation that the defendant had voluntarily provided the service in question to anyone, there was no basis for any inference that its refusal to provide it reflected anything other than legitimate business judgment.

Subsequent courts have rejected Defendants' reading of *LiveUniverse* or ignored the decision entirely.[6]  And several decisions (both before and after *LiveUniverse*) have explained that the fact-finder can "consider the termination of a prior course of dealing as a factor related to a defendant's intent (*as opposed to a required element* of a refusal to deal claim)."  *Evergreen Helicopters*, 2011 WL 285201, at *6 (emphasis added) (citing *MetroNet*, 383 F.3d at 1132 and *Trinko*, 540 U.S. at 409); *see also Safeway Inc.*, 761 F. Supp. 2d at 894; *Helicopter Transp. Servs.*, 2008 WL 151833, at *9 ("That Erickson and HTS had no prior course of dealing is immaterial.  The Supreme Court has never held that termination of a preexisting course of dealing is a necessary element of an antitrust claim.").

c.       Defendants also suggest that they did not refuse to deal with MVSC, but instead MVSC simply did not want to pay the price that Defendants were charging.  That argument is inconsistent with the Complaint's allegations.  The Complaint alleges that the fees quoted by CDK and Reynolds were so exorbitant that they would cause MVSC to lose money on every transaction – in other words, they were offers only in form, and refusals to deal in substance.  *See* Am. Compl. ¶¶ 112, 116.  Moreover, MVSC alleged that CDK and Reynolds knew and intended to quote prices that were impossible for MVSC to accept:  a CDK executive confirmed that MVSC would not be approved for 3PA access because CDK had classified EVR a "closed category," *see id.* ¶ 103; that MVSC was disfavored because it was a competitor to

---

[6] *See, e.g.*, *Evergreen Helicopters, Inc. v. Erickson Air-Crane Inc.*, Civ. No. 09–3059–PA, 2011 WL 285201, at *6 (D. Or. Jan. 26, 2011); *Safeway Inc. v. Abbott Labs.*, 761 F. Supp. 2d 874, 895 (N.D. Cal. 2011).

CVR, *see id.* ¶ 113; and that a CVR executive stated that "[w]e don't want you in the program," *id.* ¶ 117.  Defendants' assertion that MVSC rejected terms that it could have chosen to accept at most creates an issue of fact; it does not provide any basis for rejection of the claim on a motion to dismiss.[7]

### B.   MVSC Properly Alleges That Defendants Have Attempted To Monopolize The California EVR Market

MVSC has sufficiently pleaded that Defendants are attempting to monopolize the California EVR market by restricting competitors' access to dealer data stored on the Reynolds or CDK DMSs.  To "establish a Sherman Act § 2 violation for attempted monopolization, a private plaintiff seeking damages must demonstrate [three] elements:  (1) specific intent to control prices or destroy competition; (2) predatory or anticompetitive conduct directed at accomplishing that purpose; [and ] (3) a dangerous probability of achieving monopoly power." *Rebel Oil Co. v. Atlantic Richfield Co.*, 51 F.3d 1421, 1432-33 (9th Cir. 1995) (internal quotation marks omitted).  The Complaint alleges facts to support each element.

*First*, MVSC alleged that CDK, Reynolds, and CVR have the specific intent to "control prices" or "destroy competition."  *United Energy Trading, LLC v. Pacific Gas & Elec. Co.*, No. 15-cv-02383, 2016 WL 4203861, at *6 (N.D. Cal. Aug. 4, 2016); *see also* Am. Compl. ¶¶ 14, 172, 214.  Defendants do not argue that these allegations are insufficient or that MVSC otherwise failed to plead specific intent.

*Second*, for the reasons explained above, *see supra* pp. 10-19, the Complaint properly alleges that Defendants have engaged in anticompetitive conduct in an attempt to achieve a monopoly for CVR in the California EVR market – including

---

[7] CDK's citation (at 10) to *name.space, Inc. v. Internet Corp. for Assigned Names & Numbers*, No. CV 12–8676, 2013 WL 2151478 (C.D. Cal. Mar. 4, 2013), *aff'd*, 795 F.3d 1124 (9th Cir. 2015), is inapposite because the plaintiff in that case conceded that the defendant charged a flat fee to all applicants (whereas MVSC alleges that CDK and Reynolds charged inflated prices that were effectively refusals to deal) and never hinted that it was being treated differently from other applicants (whereas MVSC alleges that other vendors are charged standardized prices).

Defendants' (1) horizontal conspiracy and anticompetitive blocking tactics to eliminate independent data integrators and to block MVSC's access to dealer data; and (2) refusals to deal with MVSC.

**Third**, MVSC has pleaded that Defendants have a dangerous probability of monopolizing the California EVR market.  When considering this element, courts "consider the relevant market and the defendant's ability to lessen or destroy competition in that market."  *Portney v. CIBA Vision Corp.*, 593 F. Supp. 2d 1120, 1126 (C.D. Cal. 2008).  "'[T]here is no requirement that these elements of the antitrust claim be pled with specificity,' and an antitrust complaint will survive Rule 12(b)(6) scrutiny 'unless it is apparent from the face of the complaint that the alleged market suffers a fatal legal defect.'"  *Id.* (quoting *Newcal Indus. v. IKON Office Sol.*, 513 F.3d 1038, 1045 (9th Cir. 2008)).

"[T]he minimum showing of market share required in an attempt case is a lower quantum than the minimum showing required in an actual monopolization case."  *Rebel Oil Co.*, 51 F.3d at 1438.  Thus, the Ninth Circuit has held that a "market share of 44 percent is sufficient as a matter of law" to support a finding of market power in an attempted monopolization claim.  *Id.*  A defendant with a market share of 30 percent to 44 percent falls within a fact intensive grey-zone requiring a further inquiry into market conditions.  *See Catch Curve, Inc. v. Venali, Inc.*, 519 F. Supp. 2d 1028, 1035 (C.D. Cal. 2007).

Here, the Complaint alleges that CVR has a 40 percent share of the California EVR market, *see* Am. Compl. ¶ 80, meaning that the question of dangerous probability cannot be resolved on the pleadings.  Instead, the fact-finder at trial will be instructed to consider an array of market factors, including barriers to entry, legal licensing requirements, entrenched buyer preferences, and whether Defendants have "control of an essential or superior resource" they can use to their advantage.  *Rebel*

*Oil*, 51 F.3d at 1439.[8]  The Complaint alleges factors that would support a finding of dangerous probability.  In particular, because of their duopoly in the DMS market, CDK and Reynolds control at least 75 percent of all car dealer data in the United States – an indisputably "essential or superior resource" for EVR providers such as MVSC.  *See* Am. Compl. ¶¶ 12, 41, 84, 122-23, 137.  By depriving MVSC of necessary dealer data, Defendants are making it difficult if not impossible for dealers to do business with MVSC.  And as the Complaint alleges, those efforts are already paying off for Defendants:  dealers are leaving MVSC.[9]

## C.   The Complaint Properly Alleges that Defendants Conspired to Monopolize the California and Illinois EVR Market

MVSC likewise plausibly alleges that Defendants conspired to monopolize the Illinois and California EVR markets.  A claim of conspiracy to monopolize must allege "(1) the existence of a combination or conspiracy to monopolize; (2) an overt act in furtherance of the conspiracy; (3) the specific intent to monopolize; and (4) causal antitrust injury."  *Paladin Assocs., Inc. v. Montana Power Co.*, 328 F.3d 1145, 1158 (9th Cir. 2003).  MVSC's allegations satisfy that test:  CDK, Reynolds, and, CVR have agreed to monopolize the Illinois EVR market and attempt to monopolize the California market by excluding independent integrators and denying MVSC's repeated attempts to join 3PA and RCI.  *See* Am. Compl. ¶¶ 61-62, 79, 105-17.  They have a specific intent to monopolize, as shown through their coordinated efforts to boycott MVSC and the profits they reap from CVR's status as a

---

[8] *See also Domed Stadium Hotel, Inc. v. Holiday Inns, Inc.*, 732 F.2d 480, 490 (5th Cir. 1984) (market share below 50 percent "may support a claim for attempted monopolization if other factors such as concentration of market, high barriers to entry, consumer demand, strength of the competition, or consolidation trend in the market are present"); *RealPage, Inc. v. Yardi Sys., Inc.*, 852 F. Supp. 2d 1215, 1229 (C.D. Cal. 2012) ("determining whether a defendant has a 'dangerous probability' of successful monopolization is a fact-sensitive inquiry, in which market share is simply one factor").

[9] CDK consigns to a footnote in its argument that MVSC has failed to allege a dangerous probability of success simply because MVSC is currently the market leader in California.  *See* CDK Brief at 20 n.13.  But there is no logical or legal reason that this fact precludes a showing that CVR will soon take its place and gain a dominant position.

monopolist.  *See id.* ¶¶ 102, 143, 189-90, 197, 199, 208.  The conspiracy has caused antitrust injury to MVSC via lost business in California and the inability to compete in Illinois.  *See id.* ¶ 181.

Here again, Defendants incorrectly object that § 2 conspiracy law does not prohibit "shared monopolization."  CDK Br. at 12, 15.  There is, however, no "shared monopolization" at issue here, as MVSC alleges that Defendants conspired to make CVR a monopolist.  *See supra* pp. 10-19.

CVR's assertion that it cannot conspire with CDK and Reynolds because they are CVR's owners, *see* Memorandum in Support of CVR Motion to Dismiss, at 4 (June 15, 2017), ECF No. 60-1, is contrary to the Supreme Court's decision in *American Needle, Inc. v. Nat'l Football League*, 560 U.S. 183 (2010), which CVR fails even to cite, let alone distinguish.[10]  In that case, NFL teams had formed a joint venture, NFL Properties, to license the teams' intellectual property (trademarks, logos, and such).  After NFL Properties granted an exclusive license to Reebok, American Needle (formerly a non-exclusive licensee) sued, alleging a conspiracy in violation of § 1 of the Sherman Act.  The NFL argued that the conspiracy claim could not succeed because NFL Properties was a single entity, and decisions made concerning its operations thus were not subject to scrutiny as concerted action.  The Supreme Court rejected that argument, because the NFL teams – the owners of the venture – were separate economic entities.  *See American Needle*, 560 U.S. at 197-98.  The Court therefore concluded that any decision made directly by the teams acting in concert – as well as any decision made by NFL Properties regarding "property owned by the separate teams" – was concerted, not independent, action.  *Id.* at 200.  The relationship between the Defendants here is like the joint venture in *American Needle*, not the simple subsidiary-parent relationship at issue in

---

[10] *American Needle* concerned a § 1 claim, but courts routinely hold that § 1 intraenterprise conspiracy doctrine "is equally applicable to Section 2 conspiracy to monopolize claims." *Carpenter Tech. v. Allegheny Techs.*, 646 F. Supp. 2d 726, 734 (E.D. Pa. 2009).

*Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 769 (1984), the case relied on by Defendants.  As for the argument that NFL Properties was acting in the common interests of the teams, the Court accepted the premise but explained that it made no difference:  "illegal restraints often are in the common interests of the parties to the restraint, at the expense of those who are not parties."  *Id.* at 198.

The same reasoning applies in this case.  Although CDK and Reynolds jointly own CVR and provide EVR services through that entity, they remain separate economic entities with respect to the challenged conduct at issue in this case – blocking access to dealer data stored on their respective DMSs.  By conspiring – with each other and with CVR – to frustrate competition in the EVR market, Defendants "join[ed] together independent centers of decisionmaking," *id.* at 196, and the conduct is therefore subject to scrutiny as concerted action.

There is no inconsistency between the argument that CDK and Reynolds are liable for monopolization as owners of the CVR joint venture, and the argument under *American Needle* that Reynolds, CDK, and CVR are distinct entities for purposes of allegations of unlawful conspiracy.  The first reflects general principles of joint and several liability; the second depends on whether the agreement among the Defendants joined together "independent centers of decisionmaking" in conspiring to block MVSC's access to dealer data.  *Id.*  Here, CDK and Reynolds had no right to conspire to block MVSC from accessing dealer data just because they were co-owners of CVR.  The suggestion is directly foreclosed by *American Needle*.

## D.   MVSC Has Suffered Antitrust Injury

CDK – but not Reynolds – argues that MVSC failed to allege antitrust injury.  *See* CDK Br. at 19-20.  As an initial matter, as explained above, pp. 12-13, MVSC has alleged antitrust injury with respect to CDK's and Reynolds's 2015 Agreement to divide the data integration market and exclude independent data integrators, as MVSC is the direct consumer of data integration services.  More fundamentally,

1  CDK's argument is wrong because MVSC has alleged that Defendants' campaign to

2  exclude MVSC from the market for EVR services in Illinois and California has

3  harmed *competition* by depriving dealers and their customers of choice among EVR

4  providers.

5        Antitrust injury is harm "to . . . competition itself." *Spectrum Sports, Inc. v.*

6  *McQuillan*, 506 U.S. 447, 458 (1993).  MVSC has alleged such harm:  MVSC offers

7  a product that directly competes with CVR's, but as a result of Defendants'

8  anticompetitive conduct, MVSC has been precluded from competing in Illinois and

9  substantially hindered in California.  *See, e.g.*, Am. Compl. ¶¶ 6, 63, 181.

10  Defendants' anticompetitive conduct has harmed not only MVSC, but also

11  consumers by reducing competition, thwarting innovation, and reducing the quality

12  of EVR services.  *See id.* ¶¶ 181-88.

13        In Illinois, CDK and Reynolds have succeeded in blocking *all* EVR providers

14  – including MVSC – from gaining a foothold in the market, by excluding

15  independent data integration services and boycotting CVR's competitors from

16  obtaining the real-time dealer data required to compete.  *See id.* ¶ 120 (in California

17  and Illinois markets, "CVR is the *only* EVR provider allowed to participate in the

18  3PA and RCI programs"); *see also id.* ¶¶ 7, 141-66.[11]  That deprives dealers of a

19  choice among EVR providers, which is antitrust injury.  *See Solyndra Residual Tr.,*

20  *by & through Neilson v. Suntech Power Holdings Co.,* 62 F. Supp. 3d 1027, 1044

21  (N.D. Cal. 2014) ("The elimination of 'market alternatives' may also be considered a

22

23      [11] There is no requirement that Defendants target and exclude *all* competitors before

24  the Sherman Act is implicated.  Even injury to one competitor can be injury to competition, particularly in concentrated markets such as the Illinois and California EVR markets.  *See*

25  *Verisign, Inc. v. Internet Corp.*, No. CV 04–1292, 2004 WL 1945561, at *5 (C.D. Cal. May 18, 2004) ("[T]he Ninth Circuit cautioned courts not to be too dismissive of an injury to

26  one competitor.") (citing *Hasbrouck v. Texaco, Inc.*, 842 F.2d 1034, 1040 (9th Cir. 1988)); *Amarel v. Connell*, 102 F.3d 1494, 1508–09 (9th Cir. 1996), as amended Jan. 15, 1997

27  ("Standing is clear . . . when the plaintiff alleges that its rival engaged in an exclusionary practice designed to rid the market of the plaintiff . . . so that the defendant could maintain

28  or create a monopoly.").

MVSC'S CONSOLIDATED OPPOSITION
TO THE MOTIONS TO DISMISS OF REYNOLDS, CDK, AND CVR

form of antitrust injury.") (*quoting Glen Holly Entm't, Inc. v. Tektronix, Inc.*, 352 F.3d 367, 374 (9th Cir. 2003)).  CDK suggests that its anticompetitive conduct must target *all* market participants to be unlawful, which it argues that MVSC has failed to allege.  *See* CDK Br. at 19.  But in making that argument, CDK ignores the allegations that Defendants are blocking not only MVSC, but also other EVR providers in both Illinois and California  – where CVR competes.  *See* Am. Compl. ¶¶ 7, 120, 141-66.

Moreover, MVSC has alleged that "Defendants' actions have harmed innovation and the quality of the products and services in the marketplace."  *Id.* ¶ 183.  In California, for example, CVR takes a month or more to complete car registrations that MVSC does in a day.  *See id.* ¶ 75.  By conspiring to drive MVSC out of the market, Defendants are forcing dealerships and car customers to live with an inferior product.  *See, e.g.*, *Glen Holly Entertainment*, 352 F.3d at 374 n.3 (antitrust standing exists where the "effect of the [allegedly unlawful] agreement was to diminish innovation and quality of the product").

## III.   MVSC HAS PLEADED VIOLATIONS OF ILLINOIS AND CALIFORNIA ANTITRUST LAWS

Defendants offer no independent reason to dismiss MVSC's claims under Illinois and California antitrust laws.  Accordingly, for the same reasons that MVSC's Sherman Act claims should be allowed to proceed, its state-law antitrust claims should likewise proceed.

## IV.   MVSC HAS PLEADED ACTIONABLE VIOLATIONS OF CALIFORNIA'S UNFAIR COMPETITION LAW

California's Unfair Competition Law ("UCL") creates a cause of action against "unlawful" and "unfair" business acts and practices.  CAL. BUS. & PROF. CODE § 17200.  MVSC has pleaded conduct that "threatens an incipient violation of an antitrust law, or violates the policy or spirit of one of those laws because its

1   effects are comparable to or the same as a violation of the law, or otherwise

2   significantly threatens or harms competition." *Cel-Tech Commc'ns, Inc. v. Los*

3   *Angeles Cellular Tel. Co.*, 20 Cal. 4th 163, 187 (1999).

4          Defendants claim that MVSC's UCL allegations simply mirror its antitrust

5   claims. *See* Reynolds Br. at 20-21; CDK Br. at 21-22.  But that is not so:  MVSC

6   also alleges unfair and unlawful conduct by Defendants independent of their antitrust

7   violations, including that they made false and disparaging statements about MVSC to

8   MVSC's customers. *See, e.g.*, Am. Compl. ¶¶ 157, 166, 168, 171; *see also Byler v.*

9   *Deluxe Corp.*, 222 F. Supp. 3d 885, 899 (S.D. Cal. 2016) ("An act can be alleged to

10  violate any or all of the three prongs of the UCL — unlawful, unfair, or

11  fraudulent.").

12         Defendants also argue that MVSC has not stated a valid UCL claim because it

13  is not entitled to restitution under *Korea Supply Co. v. Lockheed Martin Corp.*, 29

14  Cal. 4th 1134, 1144-45 (2003).  But MVSC seeks permanent injunctive relief that is

15  cognizable under the UCL.  *See* Cal. Bus. & Prof. Code § 17070; *see also* Am.

16  Compl.  ¶ 16; *id.* at ¶¶ 82-83 (Prayer for Relief asking "the court . . . permanently

17  enjoin the unlawful conduct alleged herein.").

## V.    MVSC HAS PLEADED ACTIONABLE VIOLATIONS OF THE ILLINOIS CONSUMER FRAUD ACT

20         The Illinois' Consumer Fraud and Deceptive Practices Act ("ICFA"), prohibits

21  both "deceptive" and "unfair" practices in business dealings.  815 ILCS 505/1 et seq.

22  MVSC has alleged that CDK and Reynolds used their control over dealer data to

23  block MVSC from operating in Illinois, thwarting competition and harming

24  consumers.  *See* Am. Compl.  ¶¶ 104-17, 138-141.  That states an ICFA claim.  *See*

25  *People ex rel. Fahner v. Hedrich,* 108 Ill. App. 3d 83, 89-91 (1982); *Dolemba v.*

26  *Illinois Farmers Ins. Co.*, No. 15 C 463, 2016 WL 5720377, at *6 (N.D. Ill. Sept. 30,

27  2016).

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CDK asserts that the ICFA cannot "duplicate" antitrust claims, but that mischaracterizes the law's scope.  *Compare* CDK Br. at 22 *with Siegel v. Shell Oil Co.*, 480 F. Supp. 2d 1034, 1048 (N.D. Ill. 2007) ("[C]onsumers can elect to pursue a remedy under the Consumer Fraud Act where the Illinois Antitrust Act may *also provide relief*.").  But in any event, as described above, MVSC has alleged unfair and misleading conduct separate and apart from Defendants' antitrust violations.

July 31, 2017

Respectfully submitted,

*/s/ Gary Salomons*

Gary Salomons (SBN 126280)
Daniel J. Friedman (SBN 289670)
GABRIELSALOMONS, LLP
16311 Ventura Blvd., Suite 970
Encino, CA 91436
Telephone:  (818) 906-3700
Fax:  (818) 906-2142
gary@gabrielsalomons.com
daniel@gabrielsalomons.com

Michael N. Nemelka
Aaron M. Panner
Joshua D. Branson
Joshua Hafenbrack
KELLOGG, HANSEN, TODD,
   FIGEL & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
Telephone:  (202) 326-7900
Fax:  (202) 326-7999
mnemelka@kellogghansen.com
apanner@kellogghansen.com
jbranson@kellogghansen.com
jhafenbrack@kellogghansen.com

*Counsel for Plaintiff Motor Vehicle Corporation*

# Exhibit 1

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

AUTHENTICOM, INC.,

Plaintiff,

v.                                                    OPINION & ORDER

CDK GLOBAL, LLC, and                                  17-cv-318-jdp
THE REYNOLDS AND REYNOLDS COMPANY,

Defendants.

---

This is an antitrust case involving the software used by car dealers. Defendants, CDK Global, LLC, and the Reynolds and Reynolds Company, are the main providers of comprehensive software packages called dealer management systems, which are used by virtually all United States car dealers. Plaintiff, Authenticom, Inc., is a third-party data integrator. It provides a service that links car dealers to third-party software vendors who provide features and enhancements that are not built into the dealers' DMSs. Authenticom contends that defendants have violated the Sherman Act in numerous ways, including by conspiring to drive it out of business. Authenticom seeks a preliminary injunction that would require defendants to allow Authenticom to continue its historical practice of accessing dealer data on defendants' information systems, using login credentials provided by dealers.

The case is complicated both factually and legally. But based on the parties' written submissions, documentary evidence, and the evidence presented at a two-and-one-half day hearing, the court concludes that Authenticom is entitled to a preliminary injunction. Authenticom's evidence establishes at least a moderate chance of success in proving that defendants have violated the Sherman Act. And the balance of harms tips sharply in favor of

---

EXHIBIT 1

Authenticom, because Authenticom is clearly at risk of going under without a preliminary injunction. The countervailing harm alleged by defendants—primarily the threat to the security of their information systems—is not persuasive because defendants already allow third-party access of the sort that Authenticom asks to continue. And there was no evidence that Authenticom itself had lax security practices or posed a specific threat to the security of defendants' systems.

FINDINGS OF FACT

I make no effort here to set out all the facts established by the parties' evidence or to review comprehensively that evidence. The parties have submitted declarations and documentary evidence, most of which is not objected to. Defendants have, however, lodged specific objections to a number of Authenticom's exhibits and some declaration testimony in Dkt. 171. For the most part, I will sustain defendants' objections.[1]

Focusing on the main points and issues, I find the following facts. Some additional facts are set out the analysis section.

**A. Background**

Virtually every dealer in the country uses a DMS, a dealer management system, to manage the major aspects of its business, from vehicle and parts inventory to service

---

[1] The newspaper accounts and other third-party documents are hearsay, and the objected-to declaration testimony lacks foundation. I will overrule the hearsay objection to PHX-009 and PHX-099, although I did not consider those exhibits in my decision. The only objected-to documents that I did consider are PHX-156 and PHX-159, which relate to the exceptions accorded to Penske dealers. I overrule the hearsay objection to these documents; ultimately defense witnesses conceded the existence of the Penske exceptions. I also overrule the objections to PHX-150 and PHX-151, although I did not consider these documents.

2

37

---

EXHIBIT 1

appointments to payroll. Defendants, CDK Global, LLC, and the Reynolds and Reynolds Company, provide and maintain the two most-used DMSs. Together, defendants provide DMSs to roughly three-quarters of the dealers in the United States. Dozens of other DMS providers serve the remaining quarter of the market, although Dealertrack appears to be the leading alternative to defendants' systems. Defendants provide the DMS software to the dealer and run the servers that hold the dealer's data. The data itself belongs to the dealer. Sophisticated DMS software, like defendants', is expensive. A dealer typically pays $8-10,000 per month for its DMS.

Dealers also use software applications from third-party vendors to provide features and services that are not built into the basic DMS, although these applications require data from the DMS. A typical dealer uses 10 to 15 vendor-provided applications in addition to its DMS. For example, a dealer might engage Carfax to provide a vehicle history report for every used car that it offers for sale. Somehow the dealer must get data about its inventory to Carfax, so that Carfax can provide the required reports. Generally speaking, dealers find it cumbersome to retrieve their own data from their DMS and send it to vendors, so most dealers authorize vendors to get the data from the DMS, either directly or through a third-party data integrator.

**B. Authenticom**

Plaintiff Authenticom, Inc., is a third-party data integrator, founded by Steve Cottrell in 2002. With the dealer's consent, Authenticom accesses the dealer's data on its DMS, downloads the necessary data, reformats the data to suit the needs of the vendor, and then sends the reformatted data to the vendor. The vendor uses the data to provide its services to the dealer. The dealer pays the vendor for its services, and the vendor pays Authenticom for its

_____
EXHIBIT 1

data integration. Typically, a vendor pays Authenticom about $50 per month for each dealer for which data is provided.

In 2014, Authenticom introduced its DealerVault software. DealerVault provides an interface that allows dealers to monitor and control the data provided from its DMS to the vendors it uses. DealerVault is popular with dealers, who generally feel strongly that because they own their data, they should be able to control and monitor its use. Cottrell estimates that approximately 15,000 of 18,000 dealers nationwide have at one time or another relied on Authenticom for services. Dkt. 164, at 89:7-11.

The method Authenticom uses to acquire dealer data is a point of contention. Dealers who want to work with Authenticom provide Authenticom a username and password, which Authenticom uses to log into the dealer's DMS account on defendants' systems. Authenticom "screen scrapes" the data by capturing what is displayed, and then it cleans up the data to keep the needed elements. Authenticom works with a very large number of dealers, so it has automated this process. Authenticom's information systems are programmed to automatically and regularly log into dealer DMS accounts so that the data that vendors use is up to date.

The evidence generally shows that Authenticom is secure. DealerVault is hosted on Microsoft Azure, secure cloud technology. And the data to which Authenticom has access is controlled by the dealer. Wayne Fitkin, a veteran in the automotive IT industry and currently IT director for a dealership group, testified that although Fitkin himself has access to a large amount of extremely sensitive information, he creates a user ID specifically for Authenticom that has access to limited accounts and a single function necessary to query and scrape the

4

_____

EXHIBIT 1

system. Dkt. 165, at 9:12-21. The court did not receive any evidence that Authenticom has ever suffered a security breach or that it has caused a security breach at another entity.[2]

**C. Defendants block Authenticom**

Defendants object to Authenticom's screen-scraping data extraction method, which they call "hostile access." Reynolds has never approved of third-party access based solely on the *dealer's* authorization. Reynolds allows third-party access only with its own approval, and preferably via an interface specifically designed for that purpose, the Reynolds Certified Interface (RCI). Through RCI, third parties—vendors, typically—access and receive specified data fields in a highly controlled environment. Reynolds contends that access via RCI is more secure and less burdensome on the Reynolds system than Authenticom's screen-scraping technique. The court accepts this point as a general principle, but Reynolds did not provide evidence to quantify the relative burden Authenticom places on the system, and Reynolds did not adduce any evidence of any actual or realized security threat attributable to Authenticom.

Reynolds began blocking Authenticom's access to its DMS in 2009, and it achieved more effective blocking around 2013, apparently by using technology that was able to detect and instantly disconnect automated access to its DMS. Reynolds' more effective blocking had a significant impact on Authenticom's revenue, because blocking interfered with Authenticom's ability to integrate data for vendors who served dealers using Reynolds' DMS.

Unlike Reynolds, until 2015, CDK offered what the parties and the court have been calling an "open system." An open system allows third-party integrators, such as Authenticom,

---

[2] In the time Authenticom has been in operation, there has been only one reported incident with defendants: several years ago, a faulty code placed by Authenticom caused the Reynolds system to cyclically reprocess the same code.

EXHIBIT 1

to access and scrape data from the DMS with dealer authorization. Indeed, until recently, CDK touted its open system as one of the competitive advantages of its DMS. In fact, CDK itself owned and operated third-party integrators, DMI and Integralink. Apparently the open system was appealing to dealers, as Reynolds' market share declined from approximately 40 percent to approximately 28 percent as CDK marketed its open system and Reynolds solidified its closed one. *Id.* at 84:7-17. CDK picked up most of the dealers who left Reynolds.

But things changed around 2014, as CDK reconsidered its third-party access programs. Internal documents and testimony from CDK witnesses suggest that two primary concerns motivated CDK's reconsideration. First, well-publicized security breaches prompted CDK to improve its cybersecurity, and CDK implemented a "Security First" initiative. (Notably, the Security First initiative recommended improved third-party access practices and retiring "certain integration that risks data integrity", but it did not specifically recommend terminating all third-party access. DHX-27.) Second, CDK realized that it was not getting all the value it could from 3PA, its third-party access program which is, essentially, the equivalent of Reynolds' RCI. So, after years of touting the benefits of its open system, CDK decided to bring data integration in house and transition toward a closed system.

**D. The defendants' agreements**

CDK's transition to a closed system roughly coincided with CDK and Reynolds signing written agreements in February 2015. The first of the three agreements was a so-called Data Exchange Agreement. Dkt. 106-1. In the Data Exchange Agreement, CDK agreed to wind down certain aspects of DMI, CDK's third-party integrator—specifically, those aspects that involved "hostilely integrating" with the Reynolds system. Reynolds agreed that it would not block DMI's access to the Reynolds system during the wind-down period, which might last as long

EXHIBIT 1

as five years. And CDK agreed to cooperate with Reynolds to have DMI clients—vendors using DMI to poll data from the Reynolds system—transition to RCI, Reynolds' in-house "data integrator." *Id.* §§ 4.1, 4.4. Defendants further agreed that they would not assist any person that attempts to access or integrate with the other party's DMS. *Id.* § 4.5. This section is described as "not intended as a 'covenant not to compete,' but rather as a contractual restriction of access and attempted access intended to protect the operational and data security integrity of the Reynolds DMS and the CDK DMS." *Id.* Section 4.5's terms do not expire. *Id.* § 6.1.

The remaining agreements in the set—the 3PA Agreement and the RCI Agreement— granted reciprocal access to defendants' in-house data integration platforms. Both Reynolds and CDK provide add-on software applications for dealers, just like third-party vendors. CDK wanted access to the Reynolds DMS for its applications, and Reynolds wanted access to the CDK DMS for its applications. *Id.* at 2. Under the agreements, CDK's applications could access the Reynolds DMS via RCI, and vice versa. Reynolds received five free years of 3PA access, purportedly as consideration for its allowing DMI's access to the Reynolds system during the wind down. By signing up for 3PA, Reynolds agreed that it would access the CDK DMS exclusively through 3PA, and Reynolds agreed that it would not "otherwise access, retrieve, license, or otherwise transfer any data from or to a CDK System (including, without limitation, pursuant to any 'hostile interface') for itself or any other entity," or contract with any third parties to access the system. Dkt. 106-2, at 5. The RCI Agreement contains similar restrictions: "Non-Approved Access" is any access to the Reynolds DMS made without Reynolds' prior written consent. Dkt. 106-3, § 1.8.

EXHIBIT 1

**E.  The aftermath**

According to Cottrell, on the heels of the February 2015 agreements, in May 2015, Robert Schaefer, Reynolds' head of data services, told Cottrell that CDK and Reynolds agreed to support one another's data integration programs—3PA and RCI—and block third-party data integrators, like Authenticom. Reynolds was "adamant that all third-party data integrators must be cut off." Dkt. 62, ¶ 52. Schaefer denies making such statements, although the Reynolds/CDK agreements would essentially have this effect.

In August 2015, CDK began aggressively blocking Authenticom. Vendors, many of whom were understanding and willing to work with Authenticom following Reynolds' aggressive blocking in 2013, began to move their business elsewhere. According to Cottrell, Authenticom has been unable to attract new vendor customers because it cannot guarantee that it will be able to provide services without access to Reynolds' and CDK's DMSs.

Cottrell testified that in April 2016, he had a conversation with Dan McCray of CDK. McCray told Cottrell that CDK and Reynolds had agreed to "lock you and the other third parties out." *Id.* ¶ 48. According to Cottrell, McCray stated in no uncertain terms that CDK wanted to destroy Authenticom. Like Schaefer, McCray largely denies that CDK and Reynolds agreed to take concerted action, and he denies the more aggressive statements Cottrell attributes to him. But he does concede that he "confirmed that it was CDK's goal to remove all non-authorized access, including the user ID and password access Authenticom used, from the CDK DMSs in an orderly manner so as to ensure a smooth transition for CDK's dealers, the OEMs, and vendors." Dkt. 95, ¶ 11.

The consequences to Authenticom's business have been severe. Evidence from Authenticom shows a dramatic drop-off in revenue, very limited cash reserves, and breaches of

EXHIBIT 1

covenants with its lender on a substantial loan. Authenticom's financial expert, Gordon Klein, testified that Authenticom is on the brink of going under. Without court intervention, Klein estimates that Authenticom will be $1 million in the red over the next 12 months, and Klein would recommend that the bank foreclose on Authenticom's outstanding loan. Defendants' financial expert, Mark Zmijewski, testified that Authenticom has a base of revenue that is not affected by the defendants' blocking, and that there is some residual data integration revenue that is still coming in, including some from non-CDK and Reynolds dealers. He opined that the situation is not as grave as Klein portrays, that the bank would not likely foreclose, and that Authenticom could survive on a reduced scale.

### F.  Post-agreement competitive effects

Historically, the market for data integration services was competitive, with a number of providers offering services similar to Authenticom's. Now, essentially only Authenticom remains. One other vendor, SIS, is now primarily an application software vendor, but it continues to provide some vestigial data integration services. For the most part, CDK and Reynolds have brought data integration for their dealers in house.

The court received some informative, though not comprehensive, evidence regarding data integration pricing. Although Reynolds' information for pricing RCI integration services is not public, one witness, Alan Andreu, testified that when his software company, Dominion, first began using RCI in 2011, it was paying $247 per month per dealer. Come September 2017, that same data package will cost $893. Andreu also testified that Dominion was paying $457 per dealership for 3PA, CDK's integration service. Dkt. 165, at 39:1-3 ("So compared to Reynolds' 893, it's cheap—it's only $457—until you compare it to that $30 that I could have paid Authenticom."). A second vendor witness, Matthew Rodeghero with AutoLoop, testified

9

_____

EXHIBIT 1

that in 2015, Reynolds charged approximately $700 per month for a dealer using "the full suite of AutoLoop's products." *Id.* at 59:3-5. Now, that price has gone up to $835, plus additional write-back fees. Access to the CDK DMS via 3PA cost approximately $160 in 2014, $694 in 2016, and $735 in July 2017, without "any noticeable product improvements." *Id.* at 62:16-17. CDK concedes that it is now charging vendors more after the 3PA "refresh" initiative.

Defendants attempt to prevent vendors from informing dealers about the price of data integration services. According to Reynolds, its standard RCI vendor contract prohibits the vendor from discussing RCI costs because it would allow for confusing comparisons; each application's RCI interface is individualized, so prices are not comparable. Similarly, CDK prevents vendors from putting a line item on their bills attributable to 3PA charges, to prevent vendors from passing the charge through to the dealer.

### G. Security

A few points on security before the court turns to the merits. Schafer testified that the DMSs store customer information, OEM proprietary information, financial information, and other sensitive information. Schaefer testified that Authenticom scrapes data from the Reynolds DMS that it does not need. Reynolds has spent a great deal of time and money developing its "sandbox" system, including customized interface packages, real time access to data, and a journaling feature to track activity and guard against automated errors that may infect the system. In this sense, RCI provides a one-to-one relationship with applications to ensure that they receive only the data they need to serve the dealers.

One witness, Andreu, described Dynamic Reporting—Reynolds' means of allowing dealers to manually extract their data from the DMS—as "comically" and "horribly insecure." *Id.* at 43:7, 13-14. With dealer employees at the helm, it is possible that vendors will receive

EXHIBIT 1

pulled data in an unsecured email, unencrypted, despite instructions to upload the data over a secure file transfer protocol (SFTP).

ANALYSIS

To obtain a preliminary injunction, Authenticom must demonstrate that: (1) it has a better-than-negligible chance of success on the merits; and (2) it has no adequate remedy at law and that it would suffer irreparable harm without preliminary relief. *Promatek Indus., Ltd. v. Equitrac Corp.*, 300 F.3d 808, 811 (7th Cir. 2002). Once it satisfies these two preliminary elements, Authenticom must show that the harm it would suffer without the injunction would outweigh the harm that defendants would suffer if the injunction issued. *Id*. Authenticom must also show that the public interest would not be negatively affected by the injunction. *Id*. The stronger Authenticom's case on the merits, the less the balance of harms needs to tip in favor of Authenticom to support the injunction. *Id*.

**A.  Likelihood of success on the merits**

Authenticom brings a number of claims against defendants. For our purposes here, the court will focus on Authenticom's claim that defendants engaged in a horizontal conspiracy, in violation of § 1 of the Sherman Act.

"Every contract, combination . . . , or conspiracy, in restraint of trade or commerce among the several States . . . is declared to be illegal." 15 U.S.C. § 1. Horizontal agreements between competitors are per se illegal. *Toys "R" Us, Inc. v. FTC*, 221 F.3d 928, 936 (7th Cir. 2000). A plaintiff may prove the existence of a horizontal agreement by either direct or circumstantial evidence. *Id.* at 934. "When circumstantial evidence is used, there must be some evidence that 'tends to exclude the possibility' that the alleged conspirators acted

11

46

EXHIBIT 1

independently." *Id.* (quoting *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984)). "[T]o prove an antitrust conspiracy, 'a plaintiff must show the existence of additional circumstances, often referred to as "plus" factors, which, when viewed in conjunction with the parallel acts, can serve to allow a fact-finder to infer a conspiracy.'" *United States v. Apple, Inc.*, 791 F.3d 290, 315 (2d Cir. 2015) (quoting *Apex Oil Co. v. DiMauro*, 822 F.2d 246, 253 (2d Cir. 1987)), *cert. denied*, 136 S. Ct. 1376 (2016). Market division agreements—agreements to "stay out of each other's territories"—are "per se illegal, just like price-fixing agreements." *Blue Cross & Blue Shield United of Wis. v. Marshfield Clinic*, 152 F.3d 588, 591 (7th Cir. 1998). Group boycotts are per se illegal, too, i.e., "joint efforts by a firm or firms to disadvantage competitors by either directly denying or persuading or coercing suppliers or customers to deny relationships the competitors need in the competitive struggle." *Toys "R" Us*, 221 F.3d at 936 (quoting *Nw. Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.*, 472 U.S. 284, 294 (1985)).

Here, Authenticom has adduced evidence that could establish the existence of a per se illegal horizontal conspiracy. Steve Cottrell, Authenticom's founder, owner, and CEO, testified that defendants' representatives—Schaefer and McCray—told him that they had agreed to drive Authenticom from the market. Schaefer and McCray deny making these statements. But their denials were conclusory, whereas Cottrell's testimony was detailed and thus more persuasive. At this point, I will credit Cottrell's testimony.

The February 2015 agreements between CDK and Reynolds also suggest a horizontal conspiracy. Although the agreements do not explicitly state that defendants will work together to eliminate third-party data integrators, the agreements have that effect. The parties agree that they will not attempt to access, or help others access, the *other*'s DMS without permission

12

47

_____

EXHIBIT 1

(although Reynolds gives CDK a long wind-down period to transition out of the Reynolds integration business). Both parties agree to cooperate in facilitating their dealers' access to each other's software applications. And their agreements with third-party vendors—like the 3PA Agreement and the RCI Agreement—are exclusive, in the sense that defendants agreed that in their capacity as app providers, their sole access to one another's DMSs would be through the in-house interfaces. In other words, by signing up for 3PA or RCI, defendants agreed not to use third-party integrators to access the CDK DMS or the Reynolds DMS, respectively. After the agreements, there is little room in the market for third-party integrators.

Both sides adduced economic experts to explain the parties' conduct here. Authenticom's expert, Hal Singer, testified that when CDK agreed that DMI would wind down its hostile integration practices (with respect to Reynolds, at least), it gave up a competitive advantage: its "toe hold" in the Reynolds market and the opportunity to move Reynolds dealers over to CDK. Before February 2015, CDK was stealing business from Reynolds. After the agreements, it is not clear how CDK benefits. As Singer put it, CDK closed for one of two reasons: either cybersecurity issues really did motivate its move to a closed system, or Reynolds did. Singer suggests that the more reasonable implication is that CDK made an agreement with Reynolds so that it could extract higher prices for data integration services, which would more than offset the loss of dealers who were unhappy with CDK's move to a closed system. Defendants' expert, Sumanth Addanki, testified that the prime interest of both CDK and Reynolds is the DMS market, not the data integration market. And by closing its system, CDK risked losing DMS customers, so the only rational explanation is that CDK closed it system because it saw value in increasing security. It could not have been to increase data integration costs; the value is too small to be worth the trouble.

EXHIBIT 1

Neither economic expert had enough data to offer a fully compelling economic explanation for the February 2015 agreements. But Singer's analysis is more supported by the other evidence at the hearing. If a typical dealer uses 10 to 15 applications, and data integration costs are approximately $800 per application, data integration revenue per dealer is nearly the equal of the base cost of the DMS itself. Contrary to Addanki's suggestion, data integration is no sideline. Internal CDK documents also confirm that CDK's decision to refresh its 3PA program was motivated, at least in part, by a desire to realize more revenue from third-party access. And testimony from software vendors suggests that data integration prices have risen considerably, particularly in comparison to prices charged by third-party integrators.

The February 2015 agreements do not explicitly state that defendants agree to work together to freeze out third-party data integrators. But Authenticom has adduced evidence sufficient to suggest more than merely parallel conduct by independent firms.

The court will touch only briefly on Authenticom's remaining Sherman Act claims. As discussed, Authenticom has adduced evidence that suggests that defendants' contracts with vendors are exclusive dealing agreements. "Exclusive dealing involves an agreement between a vendor and a buyer that prevents the buyer from purchasing a given good from any other vendor." *Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*, 592 F.3d 991, 996 (9th Cir. 2010). Reynolds' standard vendor contract provides that the vendor and its agents are not authorized to directly or indirectly access the Reynolds DMS; they have to use RCI. PHX-53, § 1.9. A similar provision appears in the standard 3PA agreement. DHX-32, at 3 ("Vendor agrees that it will . . . access data on, and provide data to, CDK Systems exclusively through the Managed Interface System[.]").

14

49

_____

EXHIBIT 1

Unlike horizontal agreements, which are per se illegal, vertical agreements are unlawful "only if an assessment of market effects, known as a rule-of-reason analysis, reveals that they unreasonably restrain trade." *Apple*, 791 F.3d at 313-14. Under the rule of reason, an exclusive dealing arrangement violates § 1 if it forecloses competition in a substantial share of the line of commerce at issue. *Allied Orthopedic*, 592 F.3d at 996. "[A] plaintiff must prove two things to show that an exclusive-dealing agreement is unreasonable. First, he must prove that it is likely to keep at least one significant competitor of the defendant from doing business in a relevant market. If there is no exclusion of a significant competitor, the agreement cannot possibly harm competition. Second, he must prove that the probable (not certain) effect of the exclusion will be to raise prices above (and therefore reduce output below) the competitive level, or otherwise injure competition; he must show in other words that the anticompetitive effects (if any) of the exclusion outweigh any benefits to competition from it." *Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 394 (7th Cir. 1984).

Here, Authenticom has adduced evidence that defendants have effectively cut it out of the data integration market. And, as discussed above, the court received evidence suggesting that defendants are charging significantly more for data integration through RCI and 3PA than Authenticom charges for data integration. The question here would be whether defendants' higher prices are justified. Defendants explain that the costs are justified because they undertake the burden of maintaining the DMS and preserving its security. I am not persuaded for two primary reasons. First, defendants did not present evidence of the cost of data integration. They presented evidence that they had invested vast sums in their respective DMSs, which is a point taken. But the dealers already pay a lot for the DMS, and defendants did not put in any evidence to quantify the additional expense of providing data integration

EXHIBIT 1

services. Second, defendants did not show that properly managed third-party access, even using dealer credentials and screen scraping, really poses additional security risks. Reynolds allows significant exceptions by "whitelisting" certain third parties that it allows to access its system, most notably DMI, CDK's third-party integrator.

Authenticom has made the requisite likelihood of success showing. The court moves to the next factor.

## B. Adequacy of legal remedies and irreparable harm

Authenticom must demonstrate that it has no adequate remedy at law. This is a separate consideration from whether Authenticom would suffer irreparable harm, although the considerations are related, and Authenticom presents virtually the same evidence for both.

Typically, a legal remedy is inadequate for one of four reasons: (1) damages would come too late to be of meaningful value to the plaintiff; (2) plaintiff might not be able to afford the full litigation; (3) the defendant might not be collectible at the end of the litigation; or (4) the monetary damages might be too difficult to calculate. *Id.* at 386. Here, Authenticom has adduced compelling evidence that it is on the brink of collapse, which satisfies both options one and two.

As discussed in the fact section, Gordon Klein, Authenticom's financial expert, opined that defendants' continued blocking of access to dealer data would essentially destroy Authenticom's data integration business. Klein opined that without court intervention, Authenticom could be $1 million in the red over the next 12 months. And he predicted that the bank would foreclose on Authenticom's loan.

I do not find Klein's testimony fully convincing, because he has assumed nearly worst-case assumptions about business loss. But the opinions of defendants' financial expert are also

16

51

_____

EXHIBIT 1

based on assumptions rather than evidence. I find Klein's predictions closer to the mark. Reynolds' blocking, if completely effective, would cut Authenticom out of 28 percent of the market. This would be difficult, but survivable, as Authenticom has demonstrated by largely surviving Reynolds' 2013 blocking efforts by hanging on to CDK. But with CDK also blocking access, Authenticom will be cut off from nearly three-quarters of the dealers in the United States. Most third-party software vendors would be disinclined to engage a third-party integrator that could access data from only a quarter of the dealers in the United States. Authenticom may have some business lines that could survive defendants' blocking—mostly "data hygiene" services—but these services are generic data processing services that are available from many sources, and thus would not be a secure foundation for Authenticom's business that is based on its successful specialized data integration services to dealers and related software vendors.

Every day that Authenticom is unable to serve its customers, it burns more of its goodwill and solidifies its customers' doubts about its viability. Regardless of whether the evidence conclusively establishes that defendants are able to effectively and completely block Authenticom, Authenticom's customer base is growing increasingly wary of continuing to do business with it.

Authenticom has demonstrated that it does not have an adequate remedy at law and that it stands to incur irreparable harm absent court intervention.

**C.  Balance of harms**

Because Authenticom has made its threshold showings, the court considers the balance of the harms to the parties. Defendants contend that a preliminary injunction would harm them in two ways: by imposing increased security risks and overburdening their DMSs.

EXHIBIT 1

Cybersecurity. Reynolds made the more substantial showing on this point, so the court will focus on Reynolds. Defendants' security expert, Eric Rosenbach, testified that every point of access to a system is a point of vulnerability. And Reynolds has consistently resisted third-party access using dealer login credentials. Reynolds contends that RCI is more secure, substantially because it is more tightly controlled. Allowing third parties to use dealer login credentials to forage around in Reynolds' DMS renders both dealer data and the Reynolds system less secure. All this is very plausible. But for several reasons, the court is not convinced that Authenticom's access poses significant risks.

First, the evidence at the hearing showed that Authenticom does not forage around or access data beyond the legitimate needs of its customers, vendors and dealers. The court did not hear any evidence that Authenticom takes proprietary OEM data or that any extra information captured in the screen-scraping process is put to ill use.

Second, the court did not hear any evidence that Authenticom has ever experienced a security breach or facilitated a security breach of either defendant's DMS.

Third, Reynolds' Dynamic Reporting function, which Reynolds contends is an acceptable alternative to Authenticom's automated access, poses its own security risks. One witness described the use of Dynamic Reporting by dealer employees as "comically" insecure, because dealer employees often send downloaded dealer data in plain text in unencrypted emails. Dkt. 165, at 43:7, 13-14.

Fourth, Reynolds contends that it is particularly concerned about Authenticom's "machine access" to its DMS. But Reynolds presented no evidence that Authenticom's automated access was less secure than manual access by dealer employees. Also, Reynolds DMS

EXHIBIT 1

agreements prohibit dealers from disclosing passwords to non-employees, but they do not specifically prohibit automated access, if done by the dealers or their employees.

Fifth, part of the difficulty of tracking and dealing with third-party access is attributable to Reynolds' blocking efforts, and dealers' and data integrators' efforts to counter the blocking. If Authenticom were to use login credentials created specifically for Authenticom and disclosed to Reynolds, Reynolds should be able to adequately track Authenticom's access and resolve any potential problems associated with that access. The "cat and mouse" game that Schaefer described would be a thing of the past.

Sixth, and perhaps most important, Reynolds already allows many exceptions to its "no hostile integration" policy. There was ample evidence that Reynolds allowed (and even continues to allow to this day) third parties to use dealer credentials when it suited Reynolds. Although Reynolds characterized these exceptions as short-term transitional needs that are tightly controlled, the bottom line is that Reynolds allows many exceptions. And if those exceptions can be managed during a transitional period, it is hard to see how allowing Authenticom temporary access during the course of this trial would impose a serious risk.

I turn now to defendants' contention that Authenticom's access imposes an unwarranted burden on their DMSs. CDK offered evidence that Authenticom made 18,000 queries to CDK's DMS in one day. DHX-186. No one would dispute that Authenticom's queries tax defendants' systems to some degree. But defendants did not submit evidence that would allow the court to determine what proportion of overall system resources were expended on Authenticom's queries. Nor did defendants submit evidence to show how much more resources Authenticom's queries consumed than would have been consumed if the dealers and vendors had used some other, approved means of accessing data. Defendants have not shown

19

54

EXHIBIT 1

that the Authenticom's access to defendants' DMSs imposes a substantial burden, let alone one that would outweigh the harm to Authenticom if the injunction does not issue.

The balance of harms tips sharply in Authenticom's favor. It faces a very substantial risk of failure without the injunction, whereas defendants could accommodate Authenticom's access to their DMSs substantially with the resources and processes that they already have in place.

**D. The public interest**

Finally, the court considers the public interest. The court has concluded that a preliminary injunction allowing Authenticom to access dealer data on defendants' DMSs would not pose a substantial security risk. Accordingly, the court concludes that the public would not be disserved by a preliminary injunction.

Moreover, the court concludes that third-party software vendors and dealers would be served by the continued availability of Authenticom's DealerVault software and its data integrations services. Ultimately, if defendants prevail, Authenticom's business model may not be viable. But the court concludes that the public interest is served by providing Authenticom preliminary relief so that it can survive this litigation and, if it prevails, continue to provide a competitive product that has already won acceptance in the market.

**E. Injunction formalities**

**1.  Injunction bond**

Defendants contend that Authenticom should have to post a substantial bond, "to insure defendants against the substantial risks they would face as a result [of the preliminary injunction]." Dkt. 105, at 65. Defendants ask for $10 million. Authenticom, unsurprisingly,

EXHIBIT 1

contends that no bond is warranted and asks that the court waive the requirement. But if the court is inclined to require a bond, Authenticom advocates for $1 million.

Rule 65(c) provides that the court may issue a preliminary injunction "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." "The purpose of an injunction bond is to protect the restrained party from damages that it would incur in the event that the injunction was wrongfully issued." *Bader v. Wernert*, 178 F. Supp. 3d 703, 745 (N.D. Ind. 2016). "[W]hen setting the amount of security, district courts should err on the high side." *Habitat Educ. Ctr. v. U.S. Forest Serv.*, 607 F.3d 453, 456 (7th Cir. 2010) (quoting *Mead Johnson & Co. v. Abbott Labs.*, 201 F.3d 883, 888 (7th Cir.), *opinion amended on denial of reh'g*, 209 F.3d 1032 (7th Cir. 2000)).

Nevertheless, "a number of cases allow a district court to waive the requirement of an injunction bond. In some of these cases the court is satisfied that there's no danger that the opposing party will incur any damages from the injunction." *Id.* at 458. In other cases, the appropriate bond amount exceeded the movant's ability to pay, and courts balanced "the relative cost to the opponent of a smaller bond against the cost to the applicant of having to do without a preliminary injunction that he may need desperately." *Id.* (collecting cases).

Here, the court will not waive the bond requirement, but it will consider Authenticom's circumstances. Authenticom, on the verge of going out of business, is not in a position to post a $10 million bond. The court did not receive compelling evidence regarding potential harm to defendants, either in terms of cybersecurity or the burden on their DMSs. But the court did receive evidence that a preliminary injunction may require defendants to adjust their systems to accommodate Authenticom's access, and that such efforts may be costly. The court will

EXHIBIT 1

order that Authenticom post a $1 million bond, an amount that Authenticom concedes is manageable.

### 2. Form of the injunction

The court will issue a preliminary injunction that will allow Authenticom to access dealer data from defendants' DMSs—with dealer permission—during the pendency of this litigation. But the court will ask the parties to jointly propose the form of injunction. The core provision of the injunction is that defendants are to cease blocking Authenticom from using dealer login credentials to provide data integration services to dealers who authorize Authenticom to provide this service. But defendants may require that Authenticom use login credentials that allow defendants to identify and track the entity or person who is accessing their systems. Defendants may also limit the data accessed by Authenticom to those fields reasonably necessary to the services that Authenticom provides.

The parties will have one week to submit the proposed form of injunction.

### ORDER

IT IS ORDERED that:

1. Plaintiff Authenticom, Inc.'s motion for preliminary injunction, Dkt. 51, is GRANTED.

2. The parties will work together to craft the form of the injunction. The parties are ordered to confer and to submit an agreed proposed form of injunction to the court by July 21, 2017. If the parties cannot agree on all terms of the injunction, they should set out their competing proposals in the document.

57

EXHIBIT 1

3.   Defendants CDK Global, LLC, and the Reynolds and Reynolds Company's motion to admit preliminary injunction exhibits, Dkt. 168, is GRANTED.

4.   Plaintiff's motion to admit preliminary injunction exhibits, Dkt. 170, is GRANTED in part and DENIED in part, consistent with this order.

Entered July 14, 2017.

BY THE COURT:

/s/

_____

JAMES D. PETERSON
District Judge

23

58

_____
EXHIBIT 1